RICHARD G. ZIMMERMAN & another[1] *vs.* MICHAEL J. KENT & another.[2]

No. 90-P-25.

Barnstable. February 14, 1991. - July 18, 1991.

Present: WARNER, C.J., DREBEN, & IRELAND, JJ.

*Real Property*, Sale. *Sale*, Real estate. *Fraud. Damages*, Deceit. *Contract*, Sale of real estate.

The evidence in an action seeking rescission of a purchase of real property on the ground of fraudulent misrepresentation established that the representation of the seller of the property, as to the cost and characteristics of a new septic system, was a false statement of a material fact made to induce the plaintiffs to purchase the property and the judge properly concluded that the plaintiffs had reasonably relied on the representation to their detriment. [77-82]

In a civil action seeking rescission of a purchase of real property on the ground of fraudulent misrepresentation, the judge properly ordered, in connection with the rescission, that the defendants pay the plaintiffs' out-of-pocket losses, and where the plaintiffs had derived no use, enjoyment or income from the property while they held it, the judge properly denied the defendants' counterclaim for the fair value of the use of the property. [82-83]

CIVIL ACTION commenced in the Superior Court Department on April 28, 1988.

The case was heard by *Herbert F. Travers, Jr.*, J.

*Michael D. Ford* for the defendants.

*John B. Hopkins* for the plaintiffs.

IRELAND, J. This case involves rescission of a sale of real estate and an accompanying award of damages to the buyers. We draw our facts from the findings of the trial judge. The Zimmermans and the Kents resided in Connecticut. The Kents owned two summer rental properties in Chatham,

---

[1]Britt S. Zimmerman.
[2]Judith B. Kent.

Massachusetts, the subject property on Oyster Drive purchased in 1985, and another property on Morris Island purchased in 1981. The Zimmermans rented the Morris Island property for one week in each of the summers of 1984, 1985, and 1987. In the latter part of the summer of 1987, the Zimmermans sought to buy a home in Chatham. At the same time, their friends, the Kents, sought to sell their Oyster Drive property; they were asking $195,000 with a broker, or $175,000 without a broker. The parties do not dispute that they were aware that, upon a transfer of improved property, a by-law of the town of Chatham apparently required an inspection of the property's septic system and, if the system failed inspection, the installation of a new system complying with Title V of the State Sanitary Code.[3]

The Zimmermans rented the Oyster Drive property over the Columbus Day weekend in 1987, to see if it would be suitable. On their return to Connecticut, they told the Kents they were interested in the property and arranged to rent it for the weekend of October 23-25. During their second weekend stay, the Zimmermans discussed with the Kents possible terms of sale. The Zimmermans said that $195,000 was too high a price, and they offered $150,000. The Kents rejected that figure as too low. Mrs. Kent said the lowest figure they could accept would be $170,000, as they were setting aside $10,000 to "take care of" the septic system.[4]

At the time the Kents sought to sell their Oyster Drive property, an engineer was replacing the septic system at their Morris Island property. The Zimmermans knew about this work and also knew that it might be necessary for the Kents to raise the grade level of the Morris Island property to accommodate a new septic system. The trial judge found that Mrs. Kent told the Zimmermans that the engineer who was working on their Morris Island property had examined the

---

[3]The precise by-law does not appear in the record, and we do not take judicial notice of it. *Trustees of Stigmatine Fathers, Inc.* v. *Secretary of Admn. & Fin.*, 369 Mass. 562, 568 (1976). The parties, however, are in agreement about the existence and basic requirements of the by-law.

[4]The Kents admitted that they expected the septic system at the Oyster Drive property to fail the town's inspection.

Oyster Drive property and that he felt the actual replacement cost for the septic system there would be $5,000, and probably no more than $2,000 to $3,000.[5] In reality, the engineer had not examined the Oyster Drive property. Rather, he had engaged in a single conversation with the Kents, in which he told them that the Oyster Drive property was at a higher elevation than the Morris Island property and that a septic system would not be as difficult to install on the former. He further said that he thought the yard would need to be raised but not the house.

Mrs. Kent proposed that, if the Zimmermans were willing to undertake the septic renovation themselves, the purchase price would be $160,000. The Zimmermans agreed, and the parties executed a binder. On October 27, Mr. Zimmerman engaged Coastal Engineering, a firm recommended by Mrs. Kent, to design a new septic system. By November 11, Mr. Zimmerman sent that firm a deposit and a signed proposal and estimate of cost of services form.

During the weekend of November 14, 1987, the Zimmermans visited the Oyster Drive property. In the course of a discussion about the purchase of the property, Mrs. Kent told Mrs. Zimmerman that the installation of a septic system might require raising the backyard as much as eighteen in-

---

[5]The trial judge found that "[t]he defendant, Mrs. Kent, took it upon herself to assert, as of her own knowledge, that the cost would be no more than $5,000.00 and the increase in grade level would be between 6 - 9 inches but no more than 18 inches. These were stated as representations inferentially coming from an authoritative source. In fact, they had not. Mrs. Kent had stated them as facts and not as a matter of opinion, estimate or judgment." The Kents denied that Mrs. Kent ever made the representations. The trial judge, however, saw and heard the witnesses and was in a superior position to judge the weight and credibility of the evidence. *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). *Palmer* v. *Palmer*, 23 Mass. App. Ct. 245, 252 (1986). We cannot say that his finding was clearly erroneous.

The trial judge determined that Mrs. Kent's representation about the potential cost of the septic system at the Oyster Drive property derived from conversations she had with the engineer who was working on their Morris Island property. In connection with that work, the engineer provided the Kents with a "ball park" figure of $15,000 to use in arranging their finances.

ches. When Mrs. Zimmerman expressed concern,[6] Mrs. Kent said that the elevation was more likely to be no more than six to nine inches.

On November 16, 1987, the parties signed a purchase and sale agreement, which was drafted by an attorney originally retained by the Kents and who then represented both of the parties in the transaction. Under the terms of the agreement, the Zimmermans agreed to install the new septic system. The Kents insisted on closing before the end of the year, claiming that they would lose significant tax advantages if they waited. The Zimmermans wanted to wait until the spring of 1988 but acquiesced to the Kents' wishes. On November 18, the Kents engaged an engineer to test the septic system at the Oyster Drive property and, as expected, it failed. The Kents forwarded the engineering report to the Zimmermans, who sent it to Coastal Engineering. In a telephone conversation, Mrs. Kent told Mr. Zimmerman that he was "in luck" because of the ground water level the engineer had observed in a test just over the property line, behind the house. Mrs. Kent apparently believed that the ground water level would lower the cost of replacing the septic system. The trial judge found that she was comparing it to what she thought she knew about a similar but lower level reading at the Morris Island property.[7]

The parties closed in mid-December, 1987. On January 27, 1988, the Zimmermans received what the trial court judge characterized as "catastrophic" news from Coastal En-

---

[6]The trial judge characterized her response, "[t]hat is ridiculous," as an expression of "dismay" rather than an indication that she found the situation to be "unacceptable."

[7]The trial judge found that the only information the Kents had about the ground water level at the Morris Island property was obtained by putting an oar into test pits dug by the engineers. None of the parties knew that the town of Chatham required that the bottom of a septic system leach field not be less than one foot over the 100-year flood plain, which in the area in question is nine feet above mean sea level. The bottom of the leach field, therefore, would have to be no less than ten feet above mean sea level. Variances from this requirement are not permitted. Thus, the water level turned out to be of very little significance with respect to the cost and characteristics of the septic system at the Oyster Drive property.

gineering. The backyard needed to be raised at least three feet. Further, correcting the septic system would require construction of a large retaining wall, blocking the view of the water. Finally, the cost would be more than triple the outside figure ($5,000) represented to the Zimmermans by Mrs. Kent.[8]

The Zimmermans contacted the Kents, seeking to rescind the purchase. They told the Kents that they had returned all the summer rental deposits they had received because they were advised by counsel not to rent the property with an inadequate septic system. The Kents responded that two clauses in the purchase and sale agreement bound the Zimmermans.[9] The Zimmermans filed an action in Superior Court seeking rescission of the purchase and damages on the theories of fraudulent misrepresentation and mutual mistake

---

[8]The engineering firm considered several options. The one it considered to be most feasible was a conventional gravity-type system involving a tank and a disposal field. This system was designed to be four feet above ground water and would have required raising the ground level four to four and one-half feet, building retaining walls on three sides, raising the house three feet, and changing the driveway to the north side of the property. This approach would also require the granting of several variances by the town of Chatham.

Another option included a pump system which would not necessitate raising the house but would raise the effluent up about two feet to the leaching field. This option would cost more, would require the same variances as the first option, and had a greater chance of system failure. A third option involved a leaching facility about ten inches lower in elevation, a leaching chamber instead of leaching trenches, and an additional variance. This last option would result in the same finish grade as the first proposal.

The Zimmermans' engineer estimated that the cost of the proposed system and retaining wall would be about $11,000, exclusive of raising the house and landscaping. The total cost would be around $17,000; the second option would involve an additional $2,000 for the pump system but the house would not need to be raised.

[9]The Kents relied on the following:

"The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement or previously made in writing, except for the following additional warranties and representations, if any, made by either the SELLER or the Broker(s): None.

"Buyer agrees that they will assume full responsibility and the costs for any repair and/or replacement of the existing septic system."

of fact.[10] The trial judge found that Mrs. Kent provided information which was "factual in nature . . . [that] carried with it a suggestion that it came from an authoritative source" and "was intended to quell anxiety and did so." He ordered rescission of the agreement and awarded out-of-pocket damages to the Zimmermans.[11] Finding that the Zimmermans received no benefit from the property after acquiring it, the judge denied the Kents' claim to offset the out-of-pocket damages award with lost rentals.

1. *The misrepresentation claim.* The Kents argue that the trial judge erred when he determined that Mrs. Kent misrepresented the cost and characteristics of a new septic system to the Zimmermans. To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment. *Powell* v. *Rasmussen*, 355 Mass. 117, 118-119 (1969). *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 8 (1982). *Acushnet Fed. Credit Union* v. *Roderick*, 26 Mass. App. Ct. 604, 605 & n.1 (1988). The speaker need not know "that the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts are available to the speaker." *Acushnet, supra* at 605. Where the plaintiff proves "a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge . . . it is not necessary to make any further proof of an actual intent to deceive." *Snyder* v. *Sperry & Hutchin-*

---

[10]The Zimmermans also sought a declaratory judgment, pursuant to G. L. c. 231A, that they had no adequate remedy at law, which the judge denied.

[11]The judge awarded the Zimmermans damages of $21,292. Although the judge did not set forth a schedule upon which he based its measure of damages, we presume that the calculations were reasonably related to the list of expenses set forth in the judge's findings of fact, namely, $25,239.54 in interest on the amount paid from October 24, 1987, to trial with a loss of about two thirds after the appropriate tax deduction; $2,150 in engineering fees; $1,270 in taxes; $175 in utilities; $729 in insurance, $211 in plumbing, and $355 in legal fees.

*son Co.*, 368 Mass. 433, 444 (1975), quoting from *Powell* v. *Rasmussen*, *supra* at 118, in turn quoting from *Chatham Furnace Co.* v. *Moffatt*, 147 Mass. 403, 404 (1888). We examine each of these components to determine if the trial judge reasonably could have concluded that the statements by Mrs. Kent to the Zimmermans constituted the tort of misrepresentation.

The first requirement to sustain a claim of misrepresentation is that the representation made must be false. See *Kotler* v. *American Tobacco Co.*, 731 F. Supp. 50, 52 (D. Mass. 1990) (failure to show statements were untrue defeats claim of misrepresentation). There was no evidence that the engineer ever said that the backyard of the Oyster Drive property would have to be raised six to nine inches but no more than eighteen, or that the cost of overhauling the septic system would be no more than $5,000 but probably $2,000 to $3,000. Instead, there was testimony that the engineer made some general comments to the Kents about a new septic system at the Oyster Drive property. See *supra*, note 5. Mrs. Kent's representations about the price and characteristics of a new septic system were, apparently, her extrapolations from information the engineer had provided her about the Morris Island property. These representations turned out to be wrong. Her representation that the engineer had made the particularized factual statements about the cost and characteristics of a new system was altogether false.

The next requirement to sustain a claim of misrepresentation is that of "materiality," which has been defined as whether "a reasonable man would attach importance [to the fact not disclosed] in determining his choice of action in the transaction in question." *Rogen* v. *Ilikon Corp.*, 361 F.2d 260, 266 (1st Cir. 1966). See Restatement (Second) of Torts § 538(2)(a) (1976). The parties began their negotiations $45,000 apart and were unable to agree on a purchase price until the Zimmermans agreed to be responsible for the septic system. Mrs. Zimmerman had wanted to install a deck in the backyard, but learned that the overhaul of the septic system precluded that. The Kents calculated their asking price by,

inter alia, allocating a maximum of $10,000 for the septic system overhaul. That the parties resolved their haggling over the price of the property by allocating the cost of correcting the septic system, we think, underscores the trial judge's conclusion that the cost was "material."

A statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment. *Powell* v. *Rasmussen*, 355 Mass. at 118. A fact is something "susceptible of knowledge." See, e.g., *Chatham Furnace Co.* v. *Moffatt*, 147 Mass. at 406; *Yorke* v. *Taylor*, 332 Mass. 368, 371 (1955); *Acushnet Fed. Credit Union* v. *Roderick*, 26 Mass. App. Ct. at 605. Here, the misrepresentations were that the engineer had said that the cost of the new septic system would be "no more than $5,000 but probably $2,000 to $3,000," and that the backyard would need to be raised "as much as 18 inches, but probably no more than six to nine inches." Rather than deciding they were statements of opinion or judgment, the judge could reasonably have determined that Mrs. Kent's representations were of factual matters which were susceptible of knowledge. Compare *Chatham*, *supra* (assertion that iron ore existed under property held statement of fact); *Pietrazak* v. *McDermott*, 341 Mass. 107, 109-110 (1960) (builder's statement about substantially completed house "that there would be no water in the cellar" held actionable misrepresentation of fact); *Powell*, *supra* at 119 (statement that party had received and retained precise amount of money from sale of stock held matter susceptible of actual knowledge). Contrast *Harris* v. *Delco Prod., Inc.*, 305 Mass. 362, 365 (1940) (statement prior to drilling well that there was "no chance of striking salt water" was opinion); *Yerid* v. *Mason*, 341 Mass. 527, 530 (1960) (assurance by seller that installation of drain in cellar would solve difficulty of wet cellar was opinion).

The Kents argue that the misrepresentations were not of factual matters but instead were of opinion. They reason that the actual cost and characteristics of a new septic system were not matters susceptible of knowledge until their design

and installation. Even if the statements are viewed as representations about future events, they fall within an exception to the general rule precluding recovery, as they involve a situation "where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate." *Gopen* v. *American Supply Co.*, 10 Mass. App. Ct. 342, 345 (1980), quoting from Williston, Contracts § 1496, at 373-374 (3d ed. 1980). *Logan Equip. Corp.* v. *Simon Aerials, Inc.*, 736 F. Supp. 1188, 1200 (D. Mass. 1990). Of the parties, only the Kents could know that the engineer never made the statements Mrs. Kent attributed to him. Mrs. Kent's representations concerned her engineer's alleged statements about the need for and the future cost and characteristics of the septic system at the Oyster Drive property. These determinations would reasonably have been within the engineer's knowledge had he, in fact, examined the property. Compare *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 730 (1974), *S.C.*, 368 Mass. 811 (1975) (prediction concerning matter within declarant's control allows liability for misrepresentation); *Gopen* v. *American Supply Co., Inc.*, *supra* (same).

We turn next to the element of inducement. The evidence in this case shows that, at the time Mrs. Kent made her statements, the Zimmermans knew that an engineer was installing a new septic system at the Kents' Morris Island property. We agree with the trial judge that this knowledge may have lent credibility to Mrs. Kent's statements. That is, the Zimmermans could have considered that the engineer, who was professionally familiar with the design and installation of septic systems in the town of Chatham, used his expert knowledge in reaching his alleged "conclusions" about the septic system at the Oyster Drive property. In the circumstances, the trial judge could have determined that the ·Zimmermans were lulled into trusting Mrs. Kent's representations and that, as a result, they saw no need to verify her statements through their own investigation. See *Snyder* v. *Sperry & Hutchinson Co.*, 368 Mass. at 446 (recovery not

precluded for buyer lulled into placing confidence in seller's assurances and not conducting independent investigation). Cf. *Kannavos* v. *Annino*, 356 Mass. 42, 48, 50 (1969) (choice to provide information to another involves obligation to do so honestly and divulge all material facts within speaker's knowledge).

Based on the record, we think that the judge properly concluded that the Zimmermans reasonably relied on Mrs. Kent's representations. The recipient of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation. *Yorke* v. *Taylor*, 332 Mass. at 374. *Henderson* v. *D'Annolfo*, 15 Mass. App. Ct. 413, 423 (1983). Restatement (Second) of Torts § 540. To allow recovery on a claim of misrepresentation, the statement relied on must not be "preposterous or palpably false." *Yorke, supra.* Compare *Mahaney* v. *John Hancock Mut. Life Ins. Co.*, 6 Mass. App. Ct. 919, 920 (1978) (plaintiff cannot sustain claim of common law deceit where he relied upon preposterous representation). Thus, the failure of the Zimmermans to make an independent investigation of Mrs. Kent's representations does not vitiate their claim of misrepresentation. *Yorke, supra.*

With regard to the final element of misrepresentation, "[n]othing is clearer than the fact that under Massachusetts law plaintiffs need not prove that [the speaker] knew his statement to be false." *Nickerson* v. *Matco Tools Corp.*, 813 F.2d 529, 530 (1st Cir. 1987) (citing *Powell*, 355 Mass. at 118, in turn quoting from *Chatham Furnace Co.*, 147 Mass. 404). Mrs. Kent took it upon herself to present detailed measurements and cost figures to the Zimmermans that appeared to be the conclusions of her engineer; whether she believed them to be a true and accurate representation of what her engineer had previously told her does not bear on the misrepresentation claim, given that the exercise of a modicum of diligence would have revealed that the engineer never made the statements which Mrs. Kent attributed to him. *Chatham Furnace Co., supra* at 406 (one who takes it upon himself to

present as fact matter which is ascertainable as false may be liable for misrepresentation, even if he believes his statement to be true); *Acushnet*, 26 Mass. App. Ct. at 605. (knowledge of falsity not required where accurate facts reasonably available to speaker).

We conclude that the judge did not err when he determined that Mrs. Kent made statements which were false and of material fact and which were made to, and did, induce the Zimmermans' detrimental reliance.

2. *The mutual mistake claim.* In view of our decision as to misrepresentation by the Kents we need not discuss the question of mutual mistake.

3. *The remedy.* The Kents claim that the trial judge erred when he ordered rescission of the sale and further ordered the Kents to pay damages to the Zimmermans in the amount of $21,292. See note 11, *supra.* It was within the judge's authority to award the Zimmermans damages in an amount representing their "out-of-pocket" expenses in connection with the sale of the property. See *Anzalone* v. *Strand*, 14 Mass. App. Ct. 45, 49 (1982), citing *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 8-9 (1982) ("out-of-pocket" measure of damages comports with restitutional nature of tort remedies); Restatement (Second) of Torts § 552B. The purpose of the remedy is to restore the status quo as if the transaction had never occurred. See *Limoli* v. *Accettullo*, 358 Mass. 381, 385 (1970). We think the decision of the trial judge to order rescission plus out-of-pocket losses was a sound means of restoring the status quo.

. The Kents also claim that the judge erred when he denied their counterclaim to offset the Zimmermans' damages award by an amount equal to the fair value of the use of the property during the period the Zimmermans had use, possession, or control over the property. The court in *Limoli* v. *Accettullo, supra*, held that the defendants were "entitled to have the amount payable by them to the plaintiffs reduced by the fair and reasonable value, *if any*, of the plaintiffs' use . . . of the real estate . . . ." 358 Mass. at 386 (emphasis supplied). The evidence is that the Zimmermans did not rent

or otherwise use the property since they acquired it and that they informed the Kents prior to bringing this action that, on advice of counsel, they would not rent the property. It is true that the Kents would have been free to rent the property if they had not sold it to the Zimmermans, and there was evidence that the rental value of the property was $800 per week during the summer. The transfer of the property to the Zimmermans, however, called into play the by-law of the town of Chatham requiring installation of a conforming septic system on the property. Thus, during the period of time for which the Kents counterclaimed to offset the award of damages, the property did not conform to the town's sanitary requirements, and the Zimmermans derived no use, enjoyment or income from it. There was no error.

4. *Unenforceability of the purchase and sale agreement.* In view of what we have said, there is no merit in the Kents' argument that two clauses contained in the purchase and sale agreement, see note 9 *supra*, are exculpatory in nature and, therefore, allow them to enforce the terms of the agreement. See *Bates* v. *Southgate*, 308 Mass. 170, 182 (1941); *Sheehy* v. *Lipton Indus.*, 24 Mass. App. Ct. 188, 193-194 (1987).

*Judgment affirmed.*