Doerfer, J.
Plaintiff, Charles Hill (“Hill”) brought this action against Samuel Cabot, Inc. (“Cabot”) to recover damages for misrepresentation, violation of G.L.c. 93A, and for indemnification of Hill’s costs arising from the clean-up of hazardous waste on certain property pursuant to G.L.c. 2 IE. Hill alleges that Cabot concealed the presence of certain hazardous waste from Hill prior to Cabot’s sale of the property to Hill. Hill seeks declarations pursuant to G.L.c. 231A that Cabot is obligated to indemnify Hill for all costs of clean-up, and that Cabot is estopped from enforcing various agreements, which as Hill alleges, Cabot induced Hill to execute under false pretenses. Cabot has brought counterclaims against Hill to recover damages and to obtain injunctive relief.[1] Cabot has now moved for summary judgment on Hill’s claims and its own counterclaims. Hill has moved for summary judgment on each of Cabot’s counterclaims. For the reasons which follow, the defendant’s motion for summary judgment is allowed as to Hill’s claims. The defendant’s motion for summary judgment as to its own counterclaims is allowed in part and denied in part. The plaintiffs motion for summary judgment as to the defendant’s counterclaims is similarly allowed in part and denied in part.
BACKGROUND
For more than a century, Cabot or its original namesake, had owned the land and buildings located at 229 Marginal Street, in Chelsea Massachusetts (“the property”). The property was used by Cabot for, among other things, coal tar distillation, the production of “lampblack” stain manufacturing, and solvent repackaging. In 1983, Cabot purchased land in order to build a larger facility in Newburyport, Massachusetts and the Chelsea site was put up for sale. Around the time Cabot completed its new facility, the property was officially listed by the Department of Environmental Quality Engineering (“DEQE”) as a hazardous waste site. Various engineering firms performed studies on the property at the request of Cabot, which revealed the existence of hazardous material in the soil.
In 1986, Hill and Cabot began negotiations concerning the possible purchase by Hill of the property. Hill was aware of the hazardous waste at the site, but believed that the property could be cleaned up and developed, resulting in a profitable enterprise, if he could purchase it on favorable terms. (Hill Depo. pp. 3-47.) On or about August 19, 1986, Hill and Cabot entered into a Purchase and Sale Agreement (the “P&S”), pursuant to which Cabot agreed to sell, and Hill agreed to purchase, the property for $1,035,000. The P&S acknowledged the existence of hazardous material on the property, and included a provision that the sale of the property was contingent upon obtaining a written determination of the DEQE setting forth the steps necessary to correct “any hazardous waste problem” on the property.
On or about September 27, 1988, Hill, Cabot and DEQE entered into an Administrative Consent Order (“the Consent Order") which mandated the scope of clean-up required on the property. Based upon the required hazardous waste clean-up measures mandated by DEQE, Cabot agreed to lower the purchase price to $835,000. The Consent Order, among other things, required the DEQE, Hill, Cabot, and Hill’s attorney, John S. Rosenthal (“Rosenthal”), for Wynn, Rosenthal & McDonough (“WR&M”), as escrow agent, to execute an Escrow Agreement. The Escrow Agreement provided that Hill would deposit $220,000 with WR&M to assure the performance of his remediation obligations under the Consent Order. On or about December 29, 1988, the parties executed such an agreement. On the same day, Hill obtained a $220,000 loan from the Malden Trust Company (“MTC”), the proceeds of which were used to purchase two Certificates of Deposits (“CDs") in the amounts required by the Escrow Agreement.[2] The escrow agent, Rosenthal,[3] then transferred the CDs to MTC which held them as collateral to secure Hill’s repayment of the $220,000 loan.[4] Cabot had no knowledge of the transfer or pledge of the CDs as collateral at that time. In March of 1991, Hill defaulted on his loan obligations, and MTC, without informing any party to the Escrow Agreement, liquidated the CDs, thereby depleting the escrow account. Cabot has brought third-party claims against Rosenthal, Wynn, and McDonough alleging negligence (Count XIII), breach of escrow agreement (Count XIV), and misrepresentation (Count XV) arising from this incident. Cabot has also brought third-party claims against MTC,[5] Frank Moe (“Moe”) and Stephen Sullivan (“Sullivan”), who are officers at MTC, alleging negligence (Count XVI), violation of G.L.c. 93A (Count XVII), and negligent misrepresentation (Count XVIII).
On or about October 19, 1988, Hill and Cabot closed on the purchase of the property. Contemporaneous with the closing, Hill executed an Indemnification Agreement whereby Hill acknowledged that he had received at least eighteen different reports and other documents concerning the potential environmental contamination on the property. Hill agreed to indemnify Cabot for all environmental liabilities arising from the properly.
After closing, Hill discovered that the tanks located on the property contained hazardous material.[6] Hill negotiated with Cabot and executed a Settlement Agreement and General Release on or about May 1, 1989, whereby Cabot agreed to pay 85% of the actual cost for the removal of the liquid contained in “certain *48 tanks” from the properly. Hill then entered into a contract with the U.S. Environment Corporation for removal of the liquids discovered in the tanks. Cabot made an initial payment of $67,840.63 to Hill in June of 1989. Subsequently, Dennison Oil, Inc., a subcontractor hired by U.S. Environment Corporation, filed suit against both U.S. Environment and Hill alleging that it had not received payment due for the work performed at the property. The U.S. Environment case settled and Hill gave Cabot a General Release for claims arising from that case, in connection with the final payment under the Settlement Agreement.[7]
During the course of development of the property, Hill alleges that he discovered additional hazardous material located on the property, which had not been located despite Hill’s investigation, nor had it been disclosed by Cabot. Specifically, in June of 1989, Hill discovered that, below the concrete floor of the tank holding area, there was a cement bottom, concealing a significant amount of sludge consisting of sand and gravel saturated with creosote oil, located in and around the large exterior tank.[8] Hill now seeks recompense from Cabot for the alleged expenses incurred in removing and disposing of the contaminated sand found under the concrete platform in the Number 10 tank which served as a dike for smaller tanks. Cabot has brought counterclaims against alleging breach of the promissory note (Count I); breach of the consent order (Count II); breach of the indemnification agreement (Count III); breach of contract (1989 settlement agreement) (Count IV); misrepresentation (of costs paid to remove liquids from the storage tanks) (Count V); misrepresentation (that Hill would place CDs total-ling $220,000 in escrow) (Count VI); misrepresentation (that Hill would abide by agreements) (Count VTI); violation of G.L.c. 93A (Counts VIII, IX, and X); abuse of process (Count XI); and liability under G.L.c. 21E, §4 (Count XII).
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassessov. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial, may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805 (1991), accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, supra at 17. “[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
The parties have submitted several dispositive motions. For the sake of clarity, each party’s claims will be discussed separately.
I. Hill’s Claims
Cabot contends that under the terms of the various agreements (i.e. The P&S, The Consent Order, the Indemnification Agreement, the Escrow Agreement, and the 1989 and 1990 Releases), Hill is clearly responsible for any clean-up at the property. Hill asserts that Cabot’s alleged failure to disclose the hazardous waste beneath the No. 10 tank renders Hill’s agreements to release Cabot from liability for clean-up unenforceable. The most relevant documents to this controversy, P&S, the Indemnification Agreement, the 1989 Settlement Agreement, and the 1990 Release, will be discussed in turn.
The P&S Agreement
On or about August 19, 1986, Hill and Cabot entered into a twelve-page P&S agreement which had been drafted, negotiated, and reviewed by their respective counsel. The P&S contemplated that Hill and Cabot would receive a written DEQE determination of steps necessary to correct hazardous waste problems on the property. The P&S provided in relevant part,
If the BUYER acquires the Premises under this agreement, the BUYER shall, with all due diligence, undertake to remove or neutralize any existing hazardous wastes in the premises to the satisfaction of the DEQE. On the date of closing, the BUYER shall execute and deliver to the SELLER and [sic] indemnity agreement. . .
The BUYER acknowledges that the BUYER has not been influenced to enter into this transaction nor has he relied upon any warranties or representations not set forth or incorporated in this agreement. SELLER makes no representation or warranty as to the condition of the buildings on the Premises and BUYER acknowledges that said buildings are being sold in “as is” condition.
The Indemnification Agreement
Contemporaneously with the closing of the sale of the property to Hill, Hill executed the Indemnification Agreement contemplated by the P&S. In the Indemnification Agreement, Hill acknowledged the receipt of eighteen reports concerning the contamination of the property. The Indemnification Agreement states in relevant part,
*49 Buyer’s Investigation. Buyer has completed to its satisfaction a determination of the scope and nature of such hazardous wastes (as defined in the Purchase and Sale Agreement) as may exist on the Premises, and in connection therewith, has had the opportunity to discuss the history, use and condition of the Premises with Seller’s officers and employees, Seller’s engineers, Goldberg Zoino & Associates, Inc., officials of the DEQE and such other persons as Buyer has considered appropriate.
Indemnification. The Buyer shall indemnify and hold harmless Seller from and against any and all losses, liabilities, damages, demands, claims, suits, actions, judgments or causes of action, assessments, costs and expenses, including, without limitation, interest, penalties, attorneys fees, any and all expenses incurred in investigating, preparing or defending against any litigation, commenced or threatened, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation . . . asserted against, resulting to, imposed upon, or incurred or suffered by Seller, directly or indirectly, as a result of or arising from the following . . .
a. The failure of the Premises to conform to or comply with standards of environmental quality promulgated pursuant to the laws of Massachusetts or the United States . . . (emphasis added).
b. The failure of the Buyer to comply with the Administrative Consent Order issued by DEQE and executed by Buyer, Seller and DEQE or the negligent, tortious or unlawful performance of the obligations imposed pursuant to said Order.
The 1989 Settlement Agreement
Hill and Cabot entered into the 1989 Settlement Agreement after Hill complained that the tanks contained hazardous waste which Cabot had orally promised to remove. The 1989 Settlement Agreement states in relevant part,
Hill hereby forever irrevocably releases, discharges and forgives Cabot from any and all claims, demands, damages, liabilities and causes of action as may now exist or have existed at any time prior to and including the date hereof arising in Hill’s favor out of or concerning the Property, the P&S Agreement, the Note, the Indemnification Agreement and all agreements ancillary or related thereto and the transactions contemplated thereby, regardless of whether such claim, demand, damage, liability or cause of action shall be at law or in equity, actual or contingent, known or unknown, in tort, contract or any other theory of action, and irrespective of the nature of remedy sought with respect thereto. (Emphasis added.)
The 1990 Release
Six months later, in connection with the final payment under the Settlement Agreement, Hill gave Cabot another Release, which was drafted by Hill’s counsel. The Release states in relevant part,
Charles Hill, Trustee of HW Realty Trust.. . forever discharges Samuel Cabot, Incorporated ... of and from all claims, act, debts, demands, actions, causes of action, suits, dues, sum and sums of money, accounts, covenants, contracts, both in law and in equity, all claims which are the subject of, arise out of, or are connected with any and all obligations of RELEASEE to reimburse RELEASOR for any amounts paid by RELEASOR under a contract executed by RELEASOR and U.S. Environment Corp. dated June 2, 1989 . . ." (Emphasis added.)
In interpreting contracts, the court “must give effect to the parties’ intentions and construe the language to give it reasonable meaning wherever possible.” Shea v. Bay State Gas Co., 383 Mass. 218, 225 (1981). See Massachusetts Turnpike Auth. v. Perini Corp., 349 Mass. 448, 452 (1965). This basic rule of construction is equally applicable to contracts of indemnity. New York, NH & H.R.R. v. Walworth Co., 340 Mass. 1, 3 (1959), citing Century Indem Co. v. Bloom, 325 Mass. 52, 56 (1949) (“contracts of indemnify are to be fairly and reasonably construed in order to ascertain the intention of the parties and to effectuate the purpose sought to be accomplished”). “As indicated in Shea, an indemnify provision is no longer to be read with any bias in favor of the indemnitor and against the indemnitee; it is to be interpreted like any ordinary contract, with attention to language, background and purpose.” Speers v. H.P. Hood, Inc., 22 Mass.App.Ct. 598, 600, rev. denied, 398 Mass. 1105 (1986).
The P&S agreement, as well as the Indemnification Agreement and the Consent Order, explicitly express the parties’ intentions that Hill would assume the risk and bear the costs of any future clean-up. The plain language of the 1989 Settlement Agreement, executed after a controversy regarding liability for hazardous waste in the tanks, further indicates that Cabot was discharged from any and all, known or unknown future claims regarding hazardous waste on the property.[9]
In the two-year interim between the execution of the P&S and the closing, the property was tested by consultants and advisors to Hill, Cabot, and the DEQE. (Hill Exh. 23.) Hill was advised that the purchaser of the property would have (1) to continue to cooperate with the DEQE; (2) to take responsibility for the remediation of the property; and (3) to indemnify Cabot from all liability arising from the environmental condition of the property. (Hill Depo. Vol. IV at pp. 106-07, 112-13 and Vol. II at pp. 123-24.)[10] There is no evidence that Cabot in any way hindered Hill in fully investigating the level of contamination on the property prior to the closing. Thus, in light of the parties’ voluminous submissions, the court concludes that, in the absence of fraud or misrepresentation, Hill clearly assumed the risk of further hazardous waste *50 clean-up costs. See Bruno v. Bruno, 10 Mass.App.Ct. 918, 918 (1980) (“[o]ne who signs a writing that is obviously a legal document is presumed to be fully aware of its terms, unless it can be proved that he was induced to sign it by fraud or undue influence”); see also Schell v. Ford Motor Company, 270 F.2d 384, 386 (1st Cir. 1959) (“under the law of Massachusetts . . . in the absence of fraud a person may make a valid contract exempting himself from liability to another which he may in the future incur as a result of his negligence”).
Hill asserts that Cabot fraudulently represented the nature of the property by failing to disclose that hazardous waste was located beneath the “false bottom” of the No. 10 tank. Hill further asserts that Cabot’s misrepresentation vitiates any written agreements between the parties. In Bates v. Southgate, 308 Mass. 170 (1941), the leading case in this area, the Supreme Judicial Court expressly rejected the notion that “a contract must be held sacred regardless of the fraud of one of the parties in procuring it.” Bates, supra at 182. Hill’s contention that the “as is” clause in the P&S agreement can not shield Cabot from liability for misrepresentation is accurate. “Massachusetts case law rejects the assertion of ‘as is’ and like clauses as an automatic defense to allegations of fraud or deceit.” Sheehy v. LiptonIndustries, Inc., 24 Mass.App.Ct. 188, 193 (1987).
It is less clear whether an allegation of fraudulent representation would render the 1989 Settlement Agreement unenforceable. In Bates, the court recognized that “a balance must be struck between two competing values: contractual certainly and protecting innocent parties from fraud.” Turner v. Johnson & Johnson, 809 F.2d 90 (1st Cir. 1986), citing Bates, supra at 182. In Turner v. Johnson & Johnson, 809 F.2d 90 (1st Cir. 1986), the First Circuit, applying Massachusetts law, held that, where a party asserting fraud is not seeking to avoid an ambiguous or deceptive “contractual device,” but is trying to reverse the precise terms of an agreement, the threat to contractual certainty usually would outweigh the possible injustice of denying a claim of fraud. Turner, supra at 96-97. Both the circumstances surrounding the 1989 general release and the language of the release (as well as the previous agreements addressing Hill’s responsibility for hazardous waste clean-up) indicate that the issue of liability for prospective clean-up was specifically negotiated by the parties and the resolution was memorialized in each contract. See Turner, supra at 96 (barring fraud claim when plaintiffs specifically negotiated the contested issue in question).
However, even assuming arguendo that fraud would vitiate all of the parties’ transactions, Hill has failed to make out a prima facie case of material misrepresentation. See Cereghino v. Giannone, 247 Mass. 319 (1924) (the burden of proving fraud by a preponderance of the evidence rests on the party so alleging). ‘To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiffs detriment.” Zimmerman u. Kent, 31 Mass.App.Ct. 72, 77 (1991) (citations omitted). “A misrepresentation is material if it is shown that the misrepresentation was one of the principal grounds, though not necessarily the sole ground, that caused the plaintiff ‘to take the particular action that the wrongdoer intended he should take as a result of such representations and that otherwise he would not have taken such action.’ ” National Car Rental System, Inc. v. Mills Transfer Company, 7 Mass.App.Ct. 850, 852 (1979), quoting National Shawmut Bank v. Johnson, 317 Mass. 485, 490 (1945). A defendant may only be liable for fraud when the defendant had knowledge, or should have known of the defect, and where a direct relationship existed between the parties. Lawton v. Dracousis, 14 Mass.App.Ct. 164, 171 (1982), app. denied, 387 Mass. 1103 (1982).
Cabot’s president, Samuel Cabot III, and its attorney, Christopher Cabot are the only two Cabot representatives which Hill alleges to have made any representations regarding the property. In Hill’s deposition, he stated that he “has no doubt that Chris and Sam honestly don’t know” about the materials underneath the concrete platform in the No. 10 tank. (Hill Depo. Vol. Ill, p. 158.) Hill’s belief that Christopher Cabot and Samuel Cabot did not know of the materials in the No. 10 tank is confirmed by their own testimony. (S. Cabot Depo. Vol. II at p. 77; C. Cabot Depo. Vol. II at p. 74.) In response to the question of whether Hill had asked for plans or blueprints on the No. 10 tank, Hill stated,
I don’t recall ever asking for that specifically, but they did give us a lot of information which I assumed was all they had. I don’t think they necessarily withheld it. It was done a long time ago. I think they just didn’t have it.
(Hill Depo. Vol. Ill, p. 156.) Hill also stated that he did not find any public records which documented the construction of the tank. (Hill Depo. Vol. Ill, p. 159.) Rather, the only individual Hill has located with any alleged knowledge of the hazardous waste below the concrete floors of the No. 10 tank is Howard Rust, a former Cabot employee. Rust testified that “we had pumped that tank many times with our own pumps, and we had outside contractors come in and pump out some of the residue,” prior to the laying of the cement. (Rust Depo., p. 67.) Rust further testified that “(w]e pumped all we could that — I won’t say that every bit of it was removed, but what could be removed was with pumps.” (Rust Depo., p. 68.) Rust’s testimony, at most, establishes that there existed the possibility that some hazardous waste lay below the cement floor. None of Hill’s submissions establish that Cabot knew or should have known that there was in fact hazard *51 ous waste underneath Tank No. 10. “There is no liability for failing to disclose what a person does not know.” Underwood v. Risman, 414 Mass. 96, 100 (1993).
Further, Cabot made no affirmative representations as to the amount of hazardous waste on the properly nor that the Consent Order would cover every aspect of the remediation that would be necessary on the site. (Hill Depo. Vol IV, at pp. 83-83.) It is an understatement that Hill was well aware that the property was contaminated. “[Nondisclosure can be actionable only where there is a ‘duty’ to disclose” such as when the parties are in a fiduciary relationship. Greenery Rehabilitation Group v. Antaramian, 36 Mass.App.Ct. 73, 78 (1994) (holding no duty to disclose when agreement is between sophisticated businessmen active in real estate transactions). ‘The concept of fiduciary relationship thus far does not seem to have been extended to purely commercial transactions.” Salinsky v. PermaHome Corp., 15 Mass.App.Ct. 193, 197 (1983), citing Kent v. Dupree, 13 Mass.App.Ct. 44, 47 (1982). Thus, even if Hill could show that Cabot knew of the hazardous waste beneath Tank No. 10, in the absence of an affirmative representation that every particle of hazardous waste had been uncovered, Hill would not succeed in his claim.[11]
The parties’ submissions indicate that while they were both aware of the presence of hazardous waste, neither party knew of the full extent of the contamination. Thus, both engaged in two years of rigorous testing which led to the DEQE Consent Order. Cabot lowered the purchase price in lieu of the parties’ agreement to allocate to the risk of any further cleanup costs to Hill. Again, Cabot never made any assurances that the Consent Order would cover every aspect of the remediation that would be necessary on the site. (Hill Depo. Vol. IV, at pp. 83-84.) Therefore, in the absence of knowing, fraudulent misrepresentation on the part of Cabot, the Agreements[12] bar Hill’s claims for indemnification.[13] Cabot is thus entitled to summary judgment on Hill’s complaint.
II. Cabot’s Counterclaims
Cabot has brought several counterclaims against Hill. Each will be discussed in turn.
Breach of Promissory Note
Cabot seeks recovery for breach of the promissory note with which Hill paid for a portion of the Property. The note, as amended, required payment for the principal sum of $685,000. Hill admits that he failed to make payment on the promissory note in October of 1990, but contends that Cabot drew down on the letters of credit to satisfy Hill’s obligations. Hill, however, has failed to submit any documentary evidence to support his claim that Hill’s obligations have been satisfied in full. Cabot has submitted an affidavit to support his contention that there is still a deficiency of $4,119.13, even after drawing down on the letters of credit. (McGonigle Affidavit, ¶¶3-4.) Thus, Cabot is properly entitled to summary judgment on Count I of its counterclaim and, accordingly, may recover the amount of $4,119.13.
Breach of Consent Order
Cabot contends that Hill has breached the Administrative Consent Order: (1) by failing to perform remediation measures at the Property necessary to comply with requirements set forth by the DEP; and (2) by failing to provide security in the amount of $220,000 as required under the Order. Hill contends that the Consent Order creates no obligations between Hill and Cabot, as co-respondents. Rather, it creates joint obligations running from Hill and Cabot to the DEP. Thus, Hill contends that the Consent Order provides Cabot with no right of action against Hill.
While Hill’s promise to comply with the Consent Order and the Escrow Agreement was directed to the DEP, Cabot was clearly an intended beneficiary of that promise. Pursuant to G.L.c. 2 IE, the DEP can bill both Cabot, as a former owner of the property, and Hill, the current owner, for response costs. Thus, Hill’s failure to honor the terms of the Consent Order exposes Cabot to liability for clean-up costs, even though the parties privately agreed to allocate the risks of clean-up to Hill.
Further, the $220,000 in financial assurance, which Hill was supposed to place in escrow pursuant to the Consent Order and the Escrow Agreement, was to serve as the first line of recovery for the DEP if Hill should fail to abide by the Consent Order for obligations on the property. Hill’s failure to provide such security exposes Cabot to liability for all response costs, which was clearly not contemplated by the parties during their negotiations of the sale of the property. Under third-party beneficiary law, a promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty. Flattery v. Gregory, 397 Mass. 143, 147 (1986). Thus, the Consent Order properly provides Cabot with a right of action against Hill for breach of the Consent Order. Because the court concludes that Hill’s funding of the Escrow Agreement with encumbered certificates of deposit and Hill’s failure to remove the hazardous waste pursuant to the Consent Order constitute a breach, Cabot is therefore entitled to summary judgment on Count II of its counterclaim.
Breach of Indemnification Agreement
Cabot contends that it is entitled to recover for damages incurred as a result of Hill’s alleged failure to comply with the Indemnification Agreement. Hill asserts that Cabot has not sustained an “Indemnifiable Claim” which would give rise to a cause of action under the Indemnification Agreement because Cabot has not paid any money for remediation of the property nor has it paid any fines to the DEP arising from the environmental condition of the property. In sum, Hill *52 asserts that, even if Hill breached the Indemnification Agreement, Cabot has not suffered any damages.
Cabot alleges that it has suffered exorbitant legal costs as a result of Hill’s failure to abide by the Indemnification Agreement. A plain reading of the Indemnification Agreement indicates that the indemnitor is responsible for attorneys fees “incurred in . . . defending against any litigation . . . arising from . . . the failure of the Premises to conform . . . with standards of environmental quality . . .’’[14] The agreement does not by its language, nor by implication, apply only to suits brought by the DEP. Courts may award attorneys fees to prevailing parties where a contract or stipulation provides this relief. Pearson v. Board of Health of Chicopee, 402 Mass. 797, 800 (1988), citing BournewoodHosp., Inc. v. Massachusetts Commission Against Discrimination, 371 Mass. 303, 311-12 (1976); accord Waldman v. American Honda Motor Co., 413 Mass. 321, 322 (1992). Therefore, summary judgment for the defendant on Count III of its counterclaim is appropriate and, pursuant to the Indemnification Agreement, Cabot is entitled to attorneys fees and costs.[15]
Violation of G.L.c. 93A
Cabot contends that Hill’s alleged contractual violations and misrepresentations constitute “unfair and deceptive business practices” pursuant to G.L.c. 93A. To prevail on a G.L.c. 93A, §11 claim, “(t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.” Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). The undisputed fact that Hill funded the escrow account with encumbered, and essentially worthless, certificates of deposit rises to a “level of rascality” as a matter of law.[16]
The court may award multiple damages under G.L.c. 93A, §11 if the violation is knowing or willful and is causally connected to the claimed loss. A willful or knowing violation occurs when one intentionally or knowingly acts to cause harm. In order to establish a “willful or knowing" violation, there must be some evidence that the defendant had a subjectively culpable state of mind. Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 475 (1991); Bump v. Robbins, 24 Mass.App.Ct. 296, 311 (1987).
The court concludes that Hill’s purposeful encumbrance of the certificates of deposit prior to funding the escrow account rises to the level of a “willful or knowing” violation which would justify the imposition of multiple damages. See Brandt v. Olympic Constr., Inc., 16 Mass.App.Ct. 913, 916 (1983) (deliberate misrepresentation is willful and knowing violation of G.L.c. 93A giving rise to multiple damages). The determination of whether to impose double or treble damages is discretionary with the court. G.L.c. 93A, §11; Anthony’s Pier Four, supra at 475 (plaintiff is entitled to not more than treble and not less than double damages for willful or knowing violation of G.L.c. 93A). Accordingly, the court concludes that Cabot is entitled to summary judgment on its G.L.c. 93A claim and may recover double damages.
Abuse of Process
Cabot contends that Hill’s initiation of this lawsuit, “in light of his execution of the P&S, and subsequent amendments, the Indemnification Agreement, the 1989 Settlement Agreement and the 1990 General Release” constitutes an abuse of process because “Hill knew or had reason to know that his claims were entirely groundless.” (Counterclaim, ¶116.) Cabot further asserts that Hill’s claim was initiated with the improper purpose of “using the pendency of this action as an excuse not to perform his various obligations of the various written agreement; and (b) extorting further consideration in payments from Cabot.”
Abuse of process is only available if the process is used for an ulterior purpose for which it was not designed or intended. Gabriel v. Borowy, 324 Mass. 231, 236 (1949). Prior to discovery, Cabot sought dismissal based upon the agreements executed by the parties. This court (Tuttle, J.) denied the motion and found that Hill properly stated a claim upon which relief could be granted. Judge Tuttle’s decision, as well as this court’s own interpretation of the dispute, preclude it from determining that Hill’s primary motive in bringing this lawsuit was to force Cabot to contribute to the costs of clean-up. This litigation is best characterized as a good faith contract dispute, and thus, Hill is entitled to summary judgment on Cabot’s abuse of process claim.
Liability Under G.L.c. 21E, §4
Cabot contends that it is entitled to recovery under G.L.c. 2IE, §4, which provides in relevant part, “Any person who undertakes assessment, containment or removal action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such assessment, containment, or removal.”
Cabot’s president described the basis of his claim as “. . .we could possibly be responsible for Hill’s failure to clean up the property.” (S. Cabot Depo. Vol. Ill, p. 44.) When asked if Cabot had actually made payments due to that responsibility, Cabot’s president answered, “We’re spending a great deal of time, legal— money and time on legal fees.” (S. Cabot Depo. Vol. Ill, p. 44.) G.L.c. 21E, §4, on its face, does not contemplate the reimbursement of defense costs, but rather only costs associated with the assessment, containment, or removal of hazardous waste. Furthermore, earlier in this opinion, this court held that Cabot was entitled to his attorneys fees and costs pursuant to the Indemnification Agreement. Therefore, because Cabot has not yet made payments to the DEP, its claim under G.L.c. 2IE, §4 is premature. Hill is properly entitled to summary judgment on this claim.
*53 Misrepresentation
In Count VI, Cabot contends that Hill falsely represented that he would give $220,000 in CDs to his attorney, Rosenthal, as escrow agent to hold pursuant to the Escrow Agreement. Instead, Hill pledged the CDs to MTC as collateral for a $220,000 loan and placed encumbered security in the escrow account.[17]
In Count VII, Cabot alleges that Hill’s written representations that (a) he did not rely on any representations or warranties made by Cabot; (b) he had investigated the environmental conditions of the property to his satisfaction; and (c) that he indemnified Cabot from all claims arising out of the environmental condition of the property were false. Cabot further alleges that Hill’s representations were made with the intent to deceive Cabot and to induce Cabot to enter into the P&S, its subsequent amendments, the 1989 Settlement Agreement, and the 1990 General Release.
“To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiffs detriment.” Zimmerman v. Kent, 31 Mass.App.Ct. 72, 77 (1991) (citations omitted). Cabot has failed to demonstrate that, at the time of executing the various contracts, Hill falsely represented his solvency. Rather, the record appears to indicate that Hill suffered financial misfortune after closing on the property. Thus, the court cannot conclude that Cabot has made out a prima facie case of misrepresentation. Furthermore, the court’s decision to uphold the indemnification agreement, to order Hill to replace the $220,000 which was depleted from the escrow account, and to award Cabot costs and attorneys fees provides Cabot with complete relief and the court need not address this additional, and duplicative claim.[18]
III. Cabot’s Third-Party Claims
Cabot has brought claims against Rosenthal, Wynn, McDonough, Moe, and Sullivan, arising out of each parties’ respective participation in the escrow account, which was funded with encumbered CDs. In its Order, this court has required Hill to fund the escrow account with $220,000 and has concluded that Hill must indemnify Cabot for all clean-up costs on the property and pay Cabot’s reasonable attorneys fees and costs arising out of the defense of this litigation. Thus, Cabot has been afforded complete relief and the third-party defendants necessarily must be discharged, without prejudice, from this suit. In the event that Hill is insolvent and does not comply with this judgment, Cabot may then revive his claims against the third-party defendants in an attempt to obtain recovery for Hill’s breach of the escrow agreement.
ORDER
(1) For the foregoing reasons, the Defendant Samuel Cabot, Inc.’s Motion for Summary Judgment on Hill’s claims must be ALLOWED.
(2) It is hereby ORDERED and DECLARED that Samuel Cabot, Inc. has no duty to indemnify the Plaintiff Charles Hill for any costs arising from the clean-up of hazardous waste on the Chelsea property pursuant to G.L.c. 2 IE.
(3) Defendant Samuel Cabot, Inc.’s Motion for Summary Judgment must be ALLOWED as to the following Counts of its counterclaim: Breach of Promissory Note (Count I) — Recovery is allowed in the amount of $4,119.13; Breach of Consent Order (Count II), Breach of Indemnification Agreement (Count III); and Violation of G.L.c. 93A (Counts VIII, IX, X) — Damages shall be doubled.
(4) Plaintiff Charles Hill’s Motion for Summary Judgment must be ALLOWED as to the following Counts of Cabot’s counterclaim: Misrepresentation (Counts IV, V, VI, VII); Abuse of Process (Count XI); and Liability Under G.L.c. 21E, §4 (Count XII).
(5) It is hereby ORDERED and DECLARED that Plaintiff Charles Hill must indemnify Defendant Samuel Cabot, Inc. for any costs arising from the clean-up of hazardous waste on the Chelsea property pursuant to G.L.c. 2 IE.
(6) It is hereby ORDERED and DECLARED that Charles Hill must place $220,000 in an Escrow Account pursuant to the Escrow Agreement dated December 1988.
(7) It is hereby ORDERED and DECLARED that Charles Hill must pay the reasonable attorneys fees and costs of Samuel Cabot, Inc. associated with defending this action, pursuant to the Indemnification Agreement.
(8) The court hereby DISMISSES all of Cabot’s Third-Party Claims Without Prejudice. The ThirdParly Claims may be revived ONLY in the event that Hill is insolvent and cannot comply with the terms of this ORDER.

 Cabot’s counterclaims against Hill include: Breach of Promissory Note (Count I); Breach of Consent Order (Count II); Breach of Indemnification Agreement (Count III); Breach of Contract (Count IV); Misrepresentation (Counts V, VI, and VII); Violation of G.L.c. 93A (Counts VIII, IX, X); Abuse of Process (Count XI); Liability under G.L.c. 21E, §4 (Count XII).

MTC issued two CDs, the first for $140,000, the second for $80,000, both of which read, “Malden Trust Company certifies that there has been deposited with it [the respective sum] payable to John Rosenthal, Escrow Agent. . .”

According to Cabot, Rosenthal stated that he believed he was returning the CDs to the bank for safekeeping only.

Nhe promissory note, which Hill gave MTC in return for the $220,000 loan, lists the CDs as partial security.

On May 15, 1992, MTC was declared insolvent, and the Federal Deposit Insurance Corporation (“FDIC”) was appointed liquidating agent/receiver. The FDIC removed this case to the United States District Court, District of Massa *54 chusetts. On August 26,1993, District Judge Zobel dismissed Cabot’s claims against the FDIC pursuant to the D’Oench doctrine and remanded the remainder of the case to the Massachusetts Superior Court.

Hill alleges that Cabot’s agents orally represented that the tanks did not contain hazardous waste material. Cabot alleges that it was not responsible for emptying the tanks and that Hill’s contention was not memorialized in any of the writings.

The settlement provided: 1) Cabot would make payments of the additional $67,840.63 due under the Settlement Agreement: 2) Cabot would receive a general release from Hill for claims arising in that case; 3) Hill would assume an obligation to Dennison, memorialized in a promissory note in a principal amount of $30,000; and 4) U.S. Environment would receive a release from Dennison.

There existed on the property two 500,000-gallon above-ground storage tanks, as well as smaller tanks located in the interior of a building on the Property. In the mid-1970s, Cabot had converted one of the 500,000-gallon storage tanks (known as “the Number 10 tank”) into a dike to catch leaks from various storage tanks. The conversion process involved Cabot pumping all of the material out of the tank and then retaining a contractor to remove the residue. Sand and steel reinforcing rods were laid on the bottom of the tank and a concrete platform for the interior tanks was poured. Interior tanks were then rested on the platform floor of the dike. The submissions indicate that Hill received several reports which identified the Number 10 tank as a diked storage area for smaller interior tanks. (Hill Exh. 19, p. 3; Hill Exh. 24, ¶32; Hill Exh. 17, ¶2.4.)

The plain language of the 1990 Release indicates that it serves only to release Cabot from claims arising out of Cabot’s obligations to pay Hill under a contract with U.S. Environment Corp.

Hill also admits that it was his responsibility to dismantle the tanks, including the interior tanks within the No. 10 tank.

Cabot did not make any affirmative misrepresentations regarding Tank No. 10, nor did it utter any “half truths” which may have been “tantamount to a falsehood.” Province Securities Corp. v. Maryland Casualty Co., 269 Mass. 75, 92 (1929). The Agreements clearly left Hill to bear the risk of any “unknown? claims. See 1989 Settlement Agreement.

The Agreements include the Letter of Intent, the P&S, the Indemnification Agreement, the Consent Order, the Escrow Agreement, the 1989 Settlement and Release, and the 1990 Release.

Hill also asserts a violation of G.L.c. 93A claim against Cabot. To prevail on a G.L.c. 93A claim, “[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.” Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979). As previously discussed, Hill has not established that Cabot engaged in any willful or deceptive practices. Thus, the court must conclude, as a matter of law, that Cabot is entitled to summary judgment on Hill’s G.L.c. 93A claim.

Hill contends that the Indemniflcation Agreement does not provide for defense costs. The language of the Indemnification Agreement is broad and plainly covers attorneys fees. “Damages” is defined as:
any and all losses, liabilities, damages, demands, claims, suits, actions, judgments or causes of action, assessments, costs and expenses, including, without limitation, interest, penalties, attorneys fees, any and all expenses incurred in investigating, preparing or defending against any litigation, commenced or threatened, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation . . . arising from . . .
a. The failure of the Premises to conform to or comply with standards of environmental quality promulgated pursuant to the laws of Massachusetts or the United States . . . (emphasis added).

Cabot also contends that Hill has failed (a) to maintain a net worth in excess of $1,000,000; (b) to provide Cabot with biannual personal financial statements; and (c) to maintain a letter of credit in the amount of $200,000 as provided in ¶7 of the Indemnification Agreement. Hill admits in his deposition that he did not present biannual personal financial statements to Cabot, but contends that Hill was not damaged by this omission. (Hill Depo. Vol. V, pp. 12-14.) The court concludes that its decision to uphold the indemnification agreement, to order Hill to replace the $220,000 which was depleted from the escrow account, and to award Cabot costs and attorneys fees provides Cabot with complete relief and the court need not address this additional claim.

In its present decision, the court has awarded Cabot attorneys fees pursuant to his Breach of the Indenmification Agreement claim. Thus, the court need not award Cabot attorneys fees pursuant to G.L.c. 93A

When Hill was in financial distress, MTC liquidated the CDs.

In its counterclaim, Cabot further contends that “Hill breached the 1989 Settlement Agreement by misrepresenting to Cabot the cost incurred by Hill in the removal of liquids from the storage tanks, and thereby, inducing Cabot to pay 100% of the cost rather than the 85% agreed to by the parties in the 1989 Settlement Agreement.” (Counterclaim, ¶82.) Cabot bases its contention on a letter from Hill to U.S. Environment which reads that “Cabot will be paying you 85% of total billings within the contract which you will consider payment in full.” (Hill Exh. 25.) Hill asserts that a later payment to Dennison Oil was the equivalent of its missing fifteen percent required under the Cabot-Hill Settlement. The court must conclude that Cabot has not sustained its burden of proving that Hill did not pay 15% of the costs to U.S. Environment and/or Dennison Oil, on behalf of U.S. Environment. Therefore, Hill is entitled to summary judgment on Count IV and V of Cabot’s counterclaim.