# United States Court of Appeals
## For the First Circuit

No. 00-1318

ST. PAUL FIRE AND MARINE INSURANCE COMPANY,

Plaintiff, Appellant,

v.

ELLIS & ELLIS and JAMES N. ELLIS, JR.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,

and Stearns, District Judge.*

Richard R. Eurich, with whom Richard W. Jensen, Thomas C. Foley and Morrison, Mahoney & Miller, L.L.P. were on brief for plaintiff, appellant.
Michael P. Angelini, with whom James P. Hoban and Bowditch & Dewey, L.L.P. were on brief for defendant, appellee.

August 29, 2001

**LIPEZ, Circuit Judge**.    St. Paul Fire & Marine Insurance

Company appeals from the entry of judgment as a matter of law on its

claims that defendants James Ellis and Ellis & Ellis engaged in common

law fraud, unfair trade practices as proscribed by Mass. Gen. Laws ch.

93A, and statutory fraud in violation of § 14 of the Massachusetts

workers' compensation statute during Ellis's representation of David

Formoso in pursuing a claim for Workers' Compensation benefits from St.

Paul.  Although the issue of St. Paul's burden of proving the element

of damages in its fraud claim presents some complexity because of the

workers' compensation context, we nonetheless agree with St. Paul that

the trial court erred in granting defendants' motions for judgment as

a matter of law.  Consequently, we vacate the judgment of the district

court.

## I.

We recite the evidence presented at the trial in some detail

because the outcome of this appeal turns, in part, upon the proper

construction of that evidence.  Since 1981, James Ellis has been an

attorney specializing in workers' compensation law.  At the time of the

events underlying this case, he was a partner with his brother in the

firm of Ellis & Ellis, where he managed the workers' compensation

department.  The present case arises from Ellis's representation of one

person who was employed at two different jobs under two different

names: Denis Milan and David Formoso.  During 1989, this individual,

while maintaining his separate identities, had two work-related injuries, one at each place of employment.  To reduce some of the inevitable confusion regarding these dual identities, we will refer to Denis Milan only when discussing his claim for the first accident at the Victory Button Company.  Because it appears uncontradicted that David Formoso is the correct name of this individual, we will use that name in all other instances.

The first accident occurred on March 25, 1989 at the Victory Button Company.  Denis Milan, a worker at the factory, claimed an injury to his lower back after he reached up to pull some hangers. Doctors placed that injury at the L5-S1 location.  Milan sought workers' compensation benefits for this injury and filed a claim with Victory Button's insurer, Cigna Insurance Company.  The second accident occurred approximately eight months after the first, on November 17, 1989, at the Westford Regency Hotel.  David Formoso, who worked as a dishwasher at the hotel, claimed to have injured his back during a fall.  Doctors examining Formoso determined that this injury was also at the L5-S1 location in his lower back.  Formoso also sought benefits for this alleged injury, submitting a workers' compensation claim to the Massachusetts Department of Industrial Accidents on December 22, 1989.  This claim was referred to St. Paul, Westford Regency's insurer. Ellis represented Formoso in both claims.

Although Formoso was claiming a causal relationship between his back injury and the fall at the Westford Regency Hotel, the prior accident at the Victory Button Company--with its injury to the same part of the back--was never disclosed to St. Paul. Not surprisingly, the parties dispute the significance of this nondisclosure. Ellis, who testified as a hostile witness during St. Paul's case-in-chief, claimed ignorance of the concealed identity until five months after the Westford Regency Hotel accident. He did not disclose this dual identity because of his belief that Formoso was still entitled to benefits and his concern that disclosure would jeopardize Formoso's ability to remain in this country.[1] St. Paul took a darker view of Ellis's conduct, describing a fraudulent scheme to obtain workers' compensation benefits. We, of course, must view the evidence in the light most favorable to St. Paul because of the standard of review applicable to this appeal. So viewed, the evidence discloses a fraudulent scheme to obtain workers' compensation benefits.

## A. Formoso's Deceit

Three months after the Victory Button Company accident, Milan began a course of treatment for his injury. His prognosis at that time was poor, with at least one of his doctors indicating that Milan would suffer a total disability unless and until surgery was performed. That

---

[1]    Formoso appears to have been an undocumented alien, and there was evidence that, as Milan, his legal status had already been called into question.

surgery never occurred. Indeed, Milan's doctors were unanimous in concluding that he had suffered a disabling injury that prevented him, at least temporarily, from returning to work. These doctors, however, were apparently never told that during the same period that they concluded he could not work, Milan was working, as Formoso, at the Westford Regency Hotel as a dishwasher.[2] Moreover, Formoso took another job at Malu Construction in the fall of 1989, again while still under a diagnosis of disability from his doctors. Thus, during the time when Milan was diagnosed as totally disabled, Formoso was in fact performing two other jobs. In other words, the injury to Milan, though serious enough to keep Milan from working, had no corresponding effect on Formoso's ability to work.

Indeed, Formoso apparently only lost his ability to work when he suffered an accident <u>as Formoso</u> at the Westford Regency Hotel. Nonetheless, there was a basis in the evidence for questioning whether that accident actually resulted in any injury. Dr. Robert Bates, a chiropractor, treated Milan from August 10, 1989, to April 6, 1990, three times a week. Though this time period included the Westford Regency Hotel accident on November 17, 1989--and therefore should have included some loss of function corresponding to that injury--Dr. Bates

---

[2]     Ellis disputes this, claiming that Milan/Formoso only began working at the Hotel in October of 1989. The hotel owner, however, testified that Formoso was a steady employee from March of 1989 until the accident in November of 1989.

testified that Milan showed a "fairly consistent" improvement in condition. "There were . . . waxes and waning of symptoms, in other words, be a little better, a little worse; but overall he got a little bit better through the treatment."

Moreover, Dr. Bates put Milan through a series of circuit training exercises designed to improve muscle strength in his back. Dr. Bates kept logs of these exercises. These logs showed that between November 17 and December 4, 1989, and again between December 4, 1989 and February 2, 1990, Milan increased the weights he used on these machines as well as the number of repetitions he performed. In contrast, during the same period, Formoso was seen by Dr. Param Singh (on November 28, 1989), Dr. Roland Caron (on December 29, 1989) and Dr. Bernard Stone (on February 28, 1990). Dr. Singh reported that Formoso was experiencing low back pain that was "moderate to severe in intensity, constant in nature, aggravated by movements of the spine, by prolonged ambulation, prolonged standing, or any physical exertion." Dr. Caron saw surgery as an option and opined that Formoso "is totally disabled at the present time" with a "guarded" prognosis. Dr. Stone confirmed the reports of low back pain and recommended surgery as a realistic option because Formoso's symptoms were "not improving." Dr. Bates, however, considered Milan's progress on the circuit training exercises from November 17, 1989 to February 2, 1990, as indicative of a "positive result."

This evidence reveals a striking disjunction during the same time frame between Milan's improving conditions and Formoso's supposedly severe back problem.  Indeed, the medical histories of Milan and Formoso are like those of two different people.  When Milan suffered a debilitating injury, Milan needed to stop work while Formoso kept working.  Likewise, when Formoso fell at the hotel, he exhibited severe symptoms while Milan showed steady progress in his rehabilitation.  It is undisputed, however, that Milan and Formoso are the same person.  What reconciles the contradictions is a scheme to defraud St. Paul.  Before the accident at the hotel, Formoso knew--from his treatment as Milan--that the objective indicators of injury, such as x-rays, would be consistent with a lower back injury like the one he had already suffered at the Victory Button Company.[3]  He knew the symptoms the doctors would expect from that injury.  To fabricate a claim for workers' compensation benefits he only needed an accident at the hotel that he could claim resulted in symptoms identical to those he was already experiencing because of his prior injury.  He could then convince doctors that there was a causal connection between his symptoms and that accident by claiming to have no prior back injuries.  Whether the accident at the hotel was a mere fortuity or was manufactured makes no difference.  The jury could have concluded that

---

[3]     Formoso had also been injured in the same part of his back in 1987.

Formoso recognized his opportunity and, using the symptoms from his Victory Button Company injury, proceeded to claim benefits from St. Paul despite the absence of any actual injury during the fall at the hotel.

## B. Ellis's complicity in Formoso's deceit

Ellis's representation of Milan began at some point after the Victory Button accident and continued until July of 1990 when that claim was finally settled. Ellis's representation of Formoso began at least in November of 1989 and continued until July of 1994.[4] Ellis claimed that he did not learn that his office was representing one person with different claims under two different names until March 23, 1990, when Formoso came into his office and confessed to his dual identity. There was contrary evidence, however. There was testimony that Ellis himself admitted in a June 1994 hearing on Formoso's claim that he knew of the dual identity as early as December of 1989. Furthermore, one of Ellis's former associates testified that Ellis met personally with every new client during the initial intake process. Accordingly, the jury could have concluded that Ellis knew from the

---

[4]    The evidence is conflicting as to when representation of Formoso began. Ellis claimed representation did not begin until shortly before the December 1989 filing of the workers' compensation claim for the Westford Regency Hotel accident. Nonetheless, Ellis's business records indicate that his office was meeting with Formoso on his claim as early as November 28, 1989.

moment he began representing Formoso that he was also representing him in a different claim under the name of Denis Milan.

Although at trial Ellis would only admit to an awareness that Formoso was "reluctant" to tell doctors of his prior medical history, the evidence supports an inference that Ellis knew that Formoso would falsify his medical history by failing to disclose to doctors examining him after the hotel accident the prior accident at the Victory Button Company. Furthermore, although Ellis claimed that attorney-client confidentiality prevented him from revealing Formoso's dual identity to St. Paul, nothing in the record reveals that he ever sought to ensure that his analysis of that ethical issue was correct. Ellis never shared Formoso's confidences with attorneys at his own firm. Indeed, Ellis testified that during the entire period of his representation of both Milan and Formoso, he was the only person in his office who knew of the dual identity.

Also, Ellis's management of the workers' compensation department at his firm is entirely consistent with the actions of a man engaged in a fraudulent endeavor seeking to avoid exposure. Ellis controlled the flow of information in the workers' compensation department of his law firm. His method of assigning attorneys to files ensured that those attorneys were never able to gain a complete picture of any given case. Files were assigned randomly each week, with Ellis giving each attorney only enough information to allow that attorney to

deal with the specific matter at issue.  Ellis handled all of the mail and controlled its dissemination.  In short, Ellis's method of managing the practice of his department reveals a man afraid of his subordinates getting enough information to form a complete picture of the department's activities.

Likewise, Ellis went to great lengths to ensure that Formoso never had to appear before the Department of Industrial Accidents as Milan.  Though claimants would normally attend hearings on the settlement of a claim, Milan did not attend a hearing on the settlement of his claim against Cigna.  Instead, Ellis submitted an affidavit dated May 10, 1990 indicating that Milan was a resident of Mamaroneck, New York with no intent to return to Massachusetts.  On May 16, 1990, however, Formoso was in Massachusetts receiving a medical evaluation connected with the hotel accident.

In addition to actively concealing the dual identity, Ellis consistently used others as a buffer between himself and the creation and dissemination of false information in furtherance of Formoso's claim.  Formoso's doctors incorporated the false medical history in their reports, thus unknowingly creating false reports that Ellis then used to convince St. Paul to pay benefits.  Having assisted Formoso in the creation of these false reports, Ellis then used his associates, all of whom were in the dark about the true state of affairs, to unknowingly pass along that false information to St. Paul. In short,

-11-

there was abundant evidence suggesting that Ellis was a willing participant in a scheme to obtain benefits fraudulently from St. Paul.

## C. The St. Paul claim and the history of this case

St. Paul began making payments on the Formoso claim shortly after receiving it in December of 1989 and continued to honor the claim until June of 1994. During that period, Formoso was seen by numerous doctors, including several performing Independent Medical Examinations (IMEs) on behalf of St. Paul. With one exception, none of these doctors also saw Milan.[5] Without exception, none were told of the prior injury. These doctors, including Formoso's own, created reports that were forwarded to St. Paul. In fact, Ellis's office routinely forwarded the medical reports it received on Formoso's condition despite Ellis's knowledge that those reports contained false information regarding Formoso's medical history. Indeed, Ellis testified that he never tried to dissuade Formoso from lying to doctors. All of these reports attributed Formoso's symptoms to the only accident the doctors knew of: the accident at the hotel.

---

[5] Dr. Richard Hawkins saw both Milan and Formoso. Specifically, Dr. Hawkins saw Formoso on March 13, 1990 and produced a report for St. Paul. Like all of the medical reports forwarded to St. Paul, this one contained no reference to the earlier Victory Button accident. On the other hand, Dr. Hawkins saw Milan on March 27, 1990 and produced a report, forwarded to Cigna, that did not reflect the later Westford Regency accident. According to these two reports, Formoso, who was reported as weighing 220 pounds with a height of 6'1", lost both weight and height before being seen as Milan, described as weighing 195 pounds with a height of 5'10". The significance of these oddities is unclear.

St. Paul relied on these reports and their causation determinations until 1994, when it filed a motion for discontinuance to stop its payments to Formoso. At a conference on that motion on June 10th, Ellis admitted that he had known that Milan and Formoso were the same person from either December, 1989 or January, 1990. The discontinuance was eventually granted.[6] During the period of coverage, St. Paul paid $181,856.72[7] on the Formoso claim.

Approximately six months after the June conference, St. Paul filed the present action in the district court, alleging numerous counts against Ellis and Ellis & Ellis.[8] Specifically, St. Paul alleged that both Ellis and his firm in their representation of Formoso committed common law fraud; engaged in unfair trade practices in

[6]    St. Paul initially based its motion on an IME indicating an improvement in Formoso's condition, but later added allegations of fraud. Although the record is not entirely clear on this point, it appears that the Department approved the discontinuance of benefits solely because of Formoso's improvement rather than fraud.

[7]    This figure represented $140,888.75 in indemnity payments, $15,356.45 in payments to physicians, $2,420.00 in payments for Independent Medical Examinations, $10,023.70 in investigative costs, $1,237.36 in miscellaneous payments, and $11,930.46 in payments to law firms.

[8]    St. Paul also named as defendants Debra Kagan, Robert, Marquis, and Richard Surrette, all attorneys employed by Ellis & Ellis, as well as William Russel, a workers' compensation litigation administrator at the firm, Anthony Ranauro, a claims administrator at the firm, Joan Trottier, a registered nurse employed by the firm, and David Formoso. Formoso was never served and appears to no longer reside in the country. The remaining six defendants entered into a settlement with St. Paul in July of 1997, pursuant to which they were dismissed from the case.

violation of Mass. Gen. Laws ch. 93A §§ 2, 3, & 11; committed statutory fraud in violation of Mass. Gen. Laws ch. 152 § 14(2); and acted negligently. Hotly contested from the outset, the case went to trial before a jury in April of 1998 and lasted ten days. At the conclusion of St. Paul's case-in-chief, the defendants moved for judgment as a matter of law on all counts. The court granted these motions from the bench. St. Paul filed a motion for reconsideration, which the court denied in a written memorandum expanding upon its earlier reasoning. St. Paul now appeals.

## II.

We review the grant of motions for judgment as a matter of law de novo. Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 27 (1st Cir. 1998). Under the familiar standard of review, such motions may be granted only if the evidence, when taken in a light most favorable to the non-movant, "is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994); see also Logue v. Dore, 103 F.3d 1040, 1043 (1st Cir. 1997). "In carrying out this analysis the court may not take into account the credibility of witnesses, resolve evidentiary conflicts, nor ponder the weight of the evidence introduced at trial." Figueroa-Torres v. Toledo-Davila, 232 F.3d 270, 273 (1st Cir. 2000)

-14-

(quoting Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 316-17 (1st Cir. 1999)).

On appeal, St. Paul contends that the district court misapplied the burden of proof on its fraud claim and misapprehended the evidence on the ch. 93A and ch. 152 claims. We address each of these three arguments in turn.

## A. Fraud

We begin our analysis with an examination of the Massachusetts common law of fraud. The specific fraud alleged was the misrepresentation of Formoso's medical history and alternate identity. "To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." Zimmerman v. Kent, 575 N.E.2d 70, 74 (Mass. App. Ct. 1991); see also Restatement (Second) of Torts § 525 (1976); Rood v. Newberg, 718 N.E.2d 886, 892 (Mass. App. Ct. 1999). On the first of these elements (that Ellis made a false statement of material fact designed to induce St. Paul to act) there was ample evidence that Ellis gave St. Paul medical reports which he knew falsely indicated that there was only one injury.[9] The focus of the trial court's

---

[9] Ellis himself effectively conceded that the prior injury was a material fact. Materiality depends upon "whether 'a reasonable man would attach importance [to the fact not disclosed] in determining his choice of action in the transaction in question.'" Zimmerman, 575 N.E.2d at 75 (quoting Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st

decision and of the parties' arguments on appeal is upon the issues of reliance and damages.

## 1. Reliance

In concluding that St. Paul had failed to meet its burden on this issue, the district court ruled that St. Paul had failed to adduce any evidence showing that it had relied upon the lack of evidence of a prior back injury in approving Formoso's claim for workers' compensation benefits. St. Paul counters with the claim that the record contains ample evidence to prove its reliance on the misrepresentations. We agree. Under Massachusetts law, in order to prove reliance upon a misrepresentation, it is not necessary to prove that the false representations were "the sole or predominating motive that induced the victim to part with his money or property." Nat'l Shawmut Bank v. Johnson, 58 N.E.2d 849, 852 (Mass. 1945); see also Restatement (Second) of Torts § 546 cmt. b (1976) (noting that causation in fact exists if "the representation has played a substantial part, and so has been a substantial factor, in influencing his decision"). St. Paul only had to show that the false representation "alone or with other causes materially influenced [it]

Cir. 1966)) (alteration in original). Ellis admitted that a prior injury was of importance to the question of causation that was central to Formoso's claim against St. Paul. Moreover, Dr. Metzmaker explicitly testified that the existence of a prior accident and injury and its concomitant impact upon the onset of pain and other symptoms was material to the determination of that issue of causation.

to take the particular action that the wrongdoer intended [it] should take as a result of such representations and that otherwise [it] would not have taken such action." Nat'l Shawmut Bank, 58 N.E.2d at 852; Golding v. 108 Longwood Ave., Inc., 91 N.E.2d 342, 344 (Mass. 1950); Butler v. Martin, 142 N.E. 42, 43 (Mass. 1923).

When measured against this standard and with due appreciation for the circumstantial evidence adduced in this case, St. Paul provided more than enough evidence to allow a jury to conclude that Formoso's misrepresentations about his medical history were a substantial factor in its acceptance of Formoso's claim for benefits. Elaine Young was a decision maker with primary authority for the handling of the Formoso claim so long as total expenditures did not exceed $150,000. She testified explicitly to her responsibilities in handling claims. As part of those responsibilities, she would "obtain medical documentation of the person's disability, verify that the accident did happen, and . . . schedule IMEs and make payment if necessary--if seemed deemed [sic] suitable." Her decision to make payments necessarily involved an evaluation of medical reports, particularly their determinations about disability, injury, and causation. Young testified that when deciding whether payments were appropriate, she explicitly relied upon medical reports produced by IMEs. Only if those reports contained discrepancies or problems that were readily apparent from the report itself would she question their medical determinations. Indeed, the

evidence of Young's reliance upon these reports was bolstered by her testimony that she never had any doubts during her handling of the Formoso claim that an injury had occurred at the Westford Regency Hotel. This lack of doubt is unremarkable given that none of the reports contained any evidence that would have supported a contrary conclusion.

Young's evidence was bolstered by the testimony of Betty Clark, who was Young's subordinate, and by Ellis himself. Clark testified that she would make recommendations about how to proceed after conducting her own review of the records. She continued to recommend payment of Formoso's claim because she never saw "any medical documentation to file for a discontinuance." Ellis acknowledged that insurers take into account medical records and the representations about causation when making decisions in the course of a claim:

> Q. In circumstances where there is an ongoing claim for a back injury, isn't it true that those are the circumstances where an insurer, like St. Paul, would base some of their decisions on these reports?
>
> A. Some of their decisions.

This evidence is sufficient to have allowed the jury to conclude that, although not the only factor in St. Paul's decision to pay benefits, the falsified medical history contained in the medical reports was a factor in that decision.

## 2. Damages

In ruling that St. Paul failed to carry its burden of proving that it was damaged by the misrepresentations, the district court said that St. Paul had to "show that had the information about a prior injury been revealed, it would have relieved St. Paul of an obligation to pay for the injuries resulting from the" hotel accident. To carry this burden, the court reasoned, St. Paul needed to adduce evidence-- which, in this context, would need to be expert medical testimony-- demonstrating that the hotel accident either did not result in an injury or resulted in an injury that was "fleeting and temporary." We disagree with this analysis.

The court did not appreciate the manner in which the workers' compensation context of this case affects the relative burdens of the parties on the damages element of St. Paul's fraud claim. To be sure, under Massachusetts law, "[t]he burden of proving fraud by a preponderance of the evidence rests on the party alleging it." Connolly v. Rochester Shoe Tree Co., 1994 WL 879515 at *2 (Mass. Super. Ct. Nov. 8, 1994) (citing Cereghino v. Giannone, 142 N.E. 153 (1924)). This burden extends to all elements of St. Paul's claim, including damages. Ellis notes correctly that St. Paul did not have the authority to deny benefits unilaterally. Thus, even if it had chosen to contest Formoso's claim because of its discovery of the misrepresented facts, the Department of Industrial Accidents could

still have required St. Paul to cover Formoso's claim. If that had occurred, St. Paul would not have been damaged by the misrepresentation.

Nonetheless, it does not follow that because St. Paul's decision to deny the payment of benefits could be overruled by a state agency, it also bore a burden to prove in this fraud action, as Ellis claims, that "as a result of the failure to disclose Formoso's prior injuries, it was required to pay workers' compensation benefits that it would not otherwise have been obligated to pay under the worker compensation laws." In order to understand why St. Paul's burden does not extend so far, it is first necessary to examine its burden on damages absent this workers' compensation anomaly.

### a. Detrimental reliance

Once St. Paul provided evidence that it relied upon the misrepresentation, it needed to show that this reliance was detrimental in order to prove that it was damaged. <u>Zimmerman</u>, 575 N.E.2d at 78 ("[A] plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with <u>reliance on the false statement by the plaintiff to the plaintiff's detriment</u>.") (emphasis added). Here, St. Paul could meet that requirement by demonstrating that it would have contested Formoso's right to compensation if his complete history had been disclosed. <u>Nat'l Shawmut Bank</u>, 58 N.E.2d at 852; <u>Matthews</u> v. <u>Bliss</u>, 39 Mass. 48 (1839) ("If the false suggestion

-20-

had no influence, if the plaintiff[] . . . would have done the same thing . . . if such representation had not been made, then it was not a motive to the act.").

Although the district court fairly noted that St. Paul did not provide expert medical testimony directly on this point, the record contained sufficient circumstantial evidence to enable St. Paul to prove that it would have contested Formoso's right to payment if it had known his full medical history. As noted, Clark testified that the incomplete medical reports did not give grounds for seeking a discontinuance. The jury would have been entitled to conclude that at least some of those reports would have been different if the doctors examining Formoso had been told that he had a prior injury at the Victory Button Company. For instance, one of the doctors that St. Paul hired to perform an IME, Dr. Metzmaker, testified that determining causation was a significant part of his responsibilities in examining Formoso. According to Dr. Metzmaker, medical history was important to that determination because the onset of pain provided a significant clue as to the cause of the injury. Because Formoso concealed a prior injury to the same part of the back, all of the evidence of the onset of pain given to Dr. Metzmaker and the other doctors indicated that this pain began after the Westford Regency Hotel accident. The jury would have been entitled to conclude that, based upon the importance of pain in determining causation, at least some of the medical reports

-21-

would have reached a different conclusion about the cause of Formoso's symptoms, thus giving St. Paul the evidence it needed to discontinue payment.

Ellis's disclosure of the Victory Button Company accident also would have allowed St. Paul to discover the prior treatment, Formoso's dual identity, and the scheme to defraud St. Paul. It is inconceivable that St. Paul would have continued to pay benefits to Formoso under those circumstances. Thus, the evidence before the jury was more than sufficient to demonstrate that St. Paul's reliance upon the false representations was detrimental. Put another way, St. Paul proved that it was damaged by the payment of money it would not have chosen to pay if Ellis had disclosed Formoso's full medical history.

### b. St. Paul's workers' compensation obligations

We next turn to the question of whether the workers' compensation context increases St. Paul's burden beyond this showing of detrimental reliance. We first look to St. Paul's obligations under the workers' compensation laws. The existence of a second injury with a causal relationship to the accident at the Westford Regency Hotel is central to the issue of whether St. Paul was required to pay benefits to Formoso. Under Massachusetts workers' compensation law, when an employee suffers an accident that exacerbates a pre-existing injury or that causes a new injury at the same location as a prior injury, full responsibility for that injury rests with the insurer providing

-22-

coverage for the second accident and not with the insurer who was responsible for the prior injury. Thus, "[w]here an employee . . . has suffered a series of compensable injuries, he has a right to be paid compensation by the insurer on the risk at the time of the most recent injury shown to have a causal connection with his present incapacity." Falcione's Case, 26 N.E.2d 308, 309 (Mass. 1940); see also Tassone's Case, 116 N.E.2d 126, 127 (Mass. 1953); Evans's Case, 13 N.E.2d 27, 29 (Mass. 1938). Applying this principle to the present case, if Formoso was actually injured or if a prior injury was aggravated during the Westford Regency Hotel accident, then St. Paul would have been required to pay benefits despite its attempts to disclaim coverage.

It does not follow, however, that because St. Paul would have been required to pay benefits if there were a second injury, it also had the burden of proving the absence of such an injury. Indeed, Massachusetts law is squarely to the contrary. "It has uniformly been held by this court that the burden of proof remains throughout the trial on the [employee] to establish his case on all the evidence where liability is denied, or the amount to be recovered is in issue." In re Ginley, 138 N.E. 719, 720 (Mass. 1923); see also In re Quigley, 10 Mass. Workers' Comp. Rep. 291, 1996 WL 143444 at *2 (Mass. Dept. Ind. Acc. March 27, 1996) ("It is established law that the employee has the burden of proving medical causation and every other element of her claim."). This allocation of burdens remains the same whether an

-23-

insurer has denied benefits outright or has filed a motion for discontinuance. In re Quigley, 1996 WL 143444 at *2 ("The burden of proving benefit entitlement does not shift; in a discontinuance proceeding, it continues to rest on the employee."). Thus, whenever there is an issue of the assignment of causation for an injury to a specific accident, the employee bears the burden of establishing that causation. Id.

If St. Paul had discovered the fraud and contested Formoso's right to receive benefits, therefore, Formoso would have borne the burden of proving his entitlement to those benefits. We conclude that the Massachusetts courts would not shift this burden to the insurer in a later action alleging fraud. Indeed, Ellis has provided no argument explaining why the burden should shift and so increase the insurer's proof beyond a showing of detrimental reliance. Nor could he. Ellis's argument for burden shifting on the damages issue only arises once the insurer has demonstrated all of the other essential elements of a fraud that spared Formoso and Ellis the burden of proving the claim for benefits in a workers' compensation proceeding. Allowing the burden to shift to the insurer in this fraud action despite that avoidance would only serve to reward fraudulent wrongdoing. Given the striking similarities between the injuries alleged to have resulted from both the Victory Button and the Westford Regency Hotel accidents, along with the other facts of this case, that burden may have been a difficult one

for Formoso and Ellis to surmount in a workers' compensation proceeding. We decline to reward such fraud by shifting this burden to St. Paul. Of course, it remains open to Ellis, if he chooses to do so, to shoulder the burden of proving, as a defense to the damages claim in this fraud case, that despite his wrongdoing, St. Paul would still have been required to pay the benefits it paid to Formoso.[10] Cf. Lorber v. Beebe, 407 F. Supp. 279, 289 (S.D.N.Y. 1976).

Our conclusion on this point is bolstered by the Massachusetts cases analyzing burdens of proof in case within a case attorney malpractice actions. In these actions, once some form of negligence has been shown on the part of the defendant attorney in the malpractice action, the issue of the defendant's ultimate liability for damages turns upon whether his or her negligence affected the result in the prior action. The burden of proof, however, does not shift between the prior action and the action for malpractice. "The factual issues once involved in the underlying action are presented to the trier of fact in the [malpractice] case with the burden of proof placed precisely as it was in the underlying action itself." Glenn v. Aiken,

---

[10] Here, in the proof of Ellis's defense to St. Paul's allegations of fraud, expert medical testimony becomes a central issue. Medeiros v. San Toro Mfg., 7 Mass. Workers' Comp. Rep. 66, 1993 WL 117449 at *2 (Mass. Dept. Ind. Acc. April 6, 1993) ("The basic question presented here is whether there is a causal relationship between the second injury and the subsequent period of incapacity. Because such causal relation is a matter beyond the common knowledge and experience of the ordinary layman, expert medical testimony is required.").

569 N.E.2d 783, 786, 787 (Mass. 1991). Thus, if a plaintiff in the malpractice action (the status comparable to St. Paul's in this case) would not have borne the burden of proof in the underlying action, that burden does not shift to it. Instead, the negligent defendant (the status comparable to Ellis's in this case) bears the burden of showing that its negligence produced no loss to the plaintiff because, even if there had been no negligence, the underlying action would have achieved the same result. Glidden v. Terranova, 427 N.E.2d 1169, 1171 (Mass. App. Ct. 1981) ("[S]ince the client had no obligation 'to prove his case' in the underlying action (he could have simply required the plaintiff to prove his case), he should not shoulder the burden of proving a defense in the malpractice action." (quoting Nolan, Tort Law § 182 at 297)); see also Deerfield Plastics Co. v. Hartford Ins. Co., 536 N.E.2d 322, 324 (Mass. 1989) (reaching the same conclusion regarding burdens in a dispute over an insurer's unreasonable settlement of a workers' compensation claim). This principle is entirely consonant with our conclusion that the burden of proof regarding Formoso's legal entitlement to benefits did not shift to St. Paul when it filed this fraud action against Ellis.

**B. The Chapter 93A claims**

St. Paul also appeals from the entry of judgment as a matter of law on its count alleging violations of Mass. Gen. Laws ch. 93A §§ 2, 3 & 11 (ch. 93A). "Chapter 93A 'created new substantive rights by

making conduct unlawful which was not unlawful under the common law or any prior statutes.'" Schubach v. Household Finance Corp., 376 N.E.2d 140, 142 (Mass. 1978) (quoting Commonwealth v. DeCotis, 316 N.E.2d 748, 755 n.8 (Mass. 1974)). Chapter 93A proscribes "those engaged in trade or commerce from employing '[u]nfair methods of competition and unfair or deceptive acts or practices' in business transactions." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000) (quoting Mass. Gen. Laws ch. 93A, § 2). The standard for behavior that falls within the ch. 93A proscription is notably imprecise, encompassing any actions that "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce, have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness." Id. (internal quotations and citations omitted); see also St. Gobain Indus. Ceramics, Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001) (noting that ch. 93A "does not contemplate an overly precise standard of ethical or moral behavior" (quoting Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998)); Spencer v. Doyle, 733 N.E.2d 1082, 1087 (Mass. App. Ct. 2000) (noting that ch. 93A claims are neither wholly contractual or tortious, but "may encompass conduct which amounts to . . . misrepresentation").

Though ch. 93A provides a broad remedy, it is only directed at conduct that occurs in the course of trade or commerce. "[U]nfair or deceptive acts or practices" therefore can only form the basis of a ch. 93A claim if those acts "are perpetrated in a business context." Lantner v. Carson, 373 N.E.2d 973, 977 (Mass. 1978); see also First Enters., Ltd. v. Cooper, 680 N.E.2d 1163, 1165-66 (Mass. 1997) (holding that because actions relating to an internal business dispute were not intended to influence an external marketplace, the plaintiffs had failed to show the "trade or commerce" required to maintain a ch. 93A claim); Greater Boston Legal Servs. Inc. v. Haddad, 1999 WL 513885 at *2 (Mass. Super. Ct. May 3, 1999). This "trade or commerce" requirement was the basis for the district court's entry of judgment as a matter of law. Rather than focusing upon the alleged unfairness of Ellis's acts, the court instead found that any allegedly unfair acts were not performed in a business context: "In this case, any representations made by the defendants to St. Paul were pursuant to a legal action, namely the adversarial workers' compensation litigation in which Formoso's benefits were determined." Therefore, the court concluded that "Chapter 93A is inapplicable."

We disagree with the court's characterization of the events at issue here. To be sure, the "adversarial workers' compensation litigation" formed a backdrop to Ellis's actions. The jury could have easily concluded, however, that those actions were not vigorous

advocacy in pursuit of Formoso's workers' compensation claim.  Instead, the jury could have found that Ellis used the workers' compensation litigation to add a veneer of legitimacy to a fraudulent scheme to dupe St. Paul into paying benefits to which Formoso was not entitled.  Such a scheme affects trade or commerce and can be a basis for ch. 93A liability.  See Coggins v. Mooney, 1998 WL 156998 at *5 (Mass. Super. Ct. April 3, 1998), affirmed sub nonMiller v. Mooney, 725 N.E.2d 545 (Mass. 2000) (holding that lawyer can be liable under ch. 93A "to a nonclient or to an adversary of its client, if it joins its client in marketplace communications to the adversary rather than merely relays its client's positions; and if those marketplace communications knowingly or carelessly turn out to be false, misleading, and harmful"); JRJ Constr. Co. v. R.W. Granger & Sons, Inc., 1999 WL 706717 at *14 (Mass. Super. Ct. July 29, 1999) (finding that architect had engaged in trade or commerce when it allegedly made bad faith decision when resolving disputes over the scope of a subcontractor's obligations under building contract).

**C. The Chapter 152 § 14 claims**

Finally, we turn to St. Paul's challenge to the district court's entry of judgment on the ch. 152 § 14(2) claims.  Section 14(2) prohibits fraud in workers' compensation proceedings.  The statute was amended by the Massachusetts Legislature in 1991 to make its scope more

explicit.[11] In the pre-amendment version, section 14(2) specifically referenced fraud by a party.[12] That language was replaced in 1991 so that section 14(2) prohibited fraud by "a party, including an attorney or expert medical witness acting on behalf of an employee or insurer." Mass. Gen. Laws ch. 152 § 14(2). Approved on December 23, 1991, this amendment was effective upon passage. "This new amendment was deemed substantive, applying only to 'all fraudulent activity occurring after

---

[11] The current version of section 14(2) provides in pertinent part:

If it is determined that in any proceeding within the division of dispute resolution, a party, including an attorney or expert medical witness acting on behalf of an employee or insurer, concealed or knowingly failed to disclose that which is required by law to be revealed, knowingly used perjured testimony or false evidence, knowingly made a false statement of fact or law, participated in the creation or presentation of evidence which he knows to be false, or otherwise engaged in conduct that such party knew to be illegal or fraudulent, . . . the party shall be assessed, in addition to the whole costs of such proceedings and attorneys' fees, a penalty payable to the aggrieved insurer or employee, in an amount not less than the average weekly wage in the commonwealth multiplied by six.

Mass. Gen. Laws ch. 152 § 14(2). The revision to section 14(2) also vested jurisdiction for such actions in the Department of Industrial Accidents. Old section 14(2) had placed jurisdiction exclusively in the Superior Court.

[12] Old section 14(2) provided in pertinent part:

If it is determined that any party has brought, prosecuted, or defended proceedings with the intent to defraud, the party shall be assessed, in addition to the whole costs of such proceedings and attorney's fees, a penalty, payable to the aggrieved insurer or employee, in an amount not less than the average weekly wage in the commonwealth multiplied by three.

-30-

the effective date of this act.'" <u>Murphy</u> v. <u>Trans World Airlines</u>, 11 Mass. Workers' Comp. Rep. 94, 1997 WL 49706 at *3 (Mass. Dept. Ind. Acc. January 31, 1997), overruled on other grounds by <u>Murphy's Case</u> (Mass. App. Ct., slip op. 2000-P-491 March 10, 2000) (quoting St. 1991 ch. 398, § 104). Because the conduct here both preceded and continued beyond the effective date of the act, the district court considered St. Paul's section 14(2) claims under both pre- and post-amendment versions.

The district court concluded that the pre-amendment version could not apply to Ellis's conduct prior to December 23, 1991, a ruling that St. Paul does not challenge on appeal. Instead, the district court focused upon the language in amended section 14(2) limiting liability to those cases in which fraud is perpetrated "in any proceeding within the division of dispute resolution." Mass. Gen. Laws ch. 152 § 14(2). After correctly noting the paucity of case law construing section 14(2), the court turned to the decisions of the Department of Industrial Accidents, reasoning that it should be guided by decisions by the agency charged with administering chapter 152. Specifically, it relied upon the Department's interpretation of section 14(2) in <u>Murphy</u>, 1997 WL 49706, in which the Department concluded that fraud was only actionable under section 14(2) if it occurred during one of the "four stages of proceedings at the Department: conciliations, conferences, hearings, and appeals at the reviewing board." <u>Id.</u>, 1997

-31-

WL 49706 at *4. Applying this limited definition of proceeding, the court ruled that "it also appears there were no false statements in the course of any proceedings and, at the very least, not after the amendment in '91 by these defendants."

The district court confirmed this approach in its written memorandum denying St. Paul's motion for reconsideration. It also dealt with a slightly different issue: whether the Department's decision in Pirelli v. Caldor, Inc., 11 Mass. Workers Comp. Rep. 380, 1997 WL 434137 (Mass. Dept. Ind. Acc. July 25, 1997) would extend section 14(2) liability to Ellis for the false statements Formoso made to the various doctors who examined him. The court rejected this argument, concluding that "[t]here was no evidence during the trial that the defendants advised, encouraged, or counseled Formoso to make false statements to the medical examiners."

On appeal, the section 14(2) issue has become more complicated because the principal case the district court relied on, Murphy, 1997 WL 49706, has been overruled by a single justice of the Massachusetts Court of Appeals in Murphy's Case (Mass. Ct. App., slip op. 2000-P-491 March 10, 2000) (reasoning that the Department's definition of "proceeding" "read[s] the scope of G.L. c. 152 § . . . 14(2) too narrowly"). Although Murphy's Case indicates that the term "proceeding" is to be given a broad reading, it offers little guidance on any limitations on that reading. Conceivably, the term could apply

-32-

to the entire course of a workers' compensation claim, extending from the initial claim of benefits to their final termination, with only activities occurring before December 23, 1991 excluded.

Although Murphy's Case creates some ambiguity in Massachusetts law regarding the definition of "proceeding" in section 14(2), we do not have to resolve that ambiguity. Whatever its parameters, the Murphy's Case definition is broader than that adopted by the Department in Murphy v. Trans World Airlines, and we conclude that the record would allow a finding of section 14(2) liability even under the Department's more restrictive definition. In applying the Murphy decision, the Department has clarified the scope of section 14(2) liability. Such liability can be grounded upon evidence that the accused party has "participated in the creation or presentation of evidence which he knows to be false," combined with a showing that this false evidence was admitted into evidence at one of the four proceedings identified in Murphy v. Trans World Airlines. Pirelli, 1997 WL 434137 at *2 ("Pirrelli knowingly prepared the [false] Employee Earnings Report which was entered into evidence at the hearing. . . . That by itself is sufficient for the imposition of § 14(2).");[13] Carucci

_____

[13] The district court appears to have misread Pirelli in concluding that it applied only to false statements made to medical examiners. The false statements in that case, though made to a medical examiner, supported section 14(2) liability because they caused the creation of a false report that was then entered into evidence at a proceeding.

v. <u>S & F Concrete</u>, 13 Mass. Workers' Comp. Rep. 405, 1999 WL 1241233 at *5 (Mass. Dept. Ind. Acc. December 13, 1999) ("[The employee's] provision of false information about his work status to doctors, whose reports were then entered into evidence at the hearing, is likewise a 'participat[ion] in the creation . . . of evidence which he [knew] to be false.'").

Contrary to the district court's conclusion, the record contains evidence that would support the conclusion that Ellis participated in the creation of false evidence that was later admitted in a proceeding before the Department. In the late fall of 1993, Dr. Arthur Safron performed an IME on Formoso. In connection with that examination, he created a report on November 27, 1993. That report indicated that Formoso "specifically denies any pre-existing back problem." Ellis admitted that he knew that Formoso's statement was false, and a jury would be entitled to conclude that Ellis knew that Formoso would make such false statements when examined by doctors. Despite his knowledge of this false report, Ellis took no action to prevent its use in a Department proceeding, and on February 27, 1994, this report was entered into evidence during a conciliation related to St. Paul's motion for a discontinuance. Under the interpretation of the statute provided by the Department, this is sufficient evidence to ground liability under 14(2).

**III.**

In conclusion, we note that St. Paul also argues in the alternative that the district court abused its discretion by placing limitations upon the testimony of three of St. Paul's witnesses and then entering judgment as a matter of law against it because of the insufficiency of its evidence.  Having concluded that St. Paul's evidence was sufficient without the testimony of these three witnesses, we decline to address this alternative argument.

**Judgment vacated.  Remanded for further proceedings consistent with this decision.**