Kaplan, Mitchell H., J.
INTRODUCTION
The plaintiffs, Rose Loltek-Jick and Todd Jick (the “Jicks") had previously brought an action against an interior designer, James Swan and James Swan and Co., Inc. (collectively, “Swan”), in the Suffolk Superior Court, as a result of work that Swan was performing for the Jicks in connection with the construction of their home in Chestnut Hill, Massachusetts (the “Swan litigation”). The defendants in this action, Austin OToole and his law firm (collectively OToole), represented Swan in the Swan litigation. In 2008, following an arbitration, final judgment entered in favor of the Jicks in the Swan litigation for money damages of approximately $200,000 and ordering the delivery of certain furnishings. In 2009, Swan filed a bankruptcy petition, and the Jicks have been unable to recover on their judgment. In this action, the Jicks assert that OToole is liable to them because of statements that he made in court and before the arbitrator in the course of representing Swan. The Jicks’ Second Amended Complaint is pled in three counts sounding in negligence, misrepresentation, and a violation of G.L.c. 93A, respectively. The negligence count has previously been dismissed for failure to state a claim.
This case is presently before the court on O’Toole’s partial motion for summary judgment dismissing Count III, which alleges a violation of Chapter 93A-.-O’Toole addressed his summaryjudgment motion only to Count III because of a procedural order previously entered in this case that only permitted him to engage in discovery and move for summary judgment with respect to that count. However, one of the arguments which O’Toole raises in support of his motion to dismiss Count III, i.e., that an attorney cannot be held liable to a third party in a civil action based on statements made in court while representing his client, is equally applicable both to the misrepresentation claim asserted in Count II and the Chapter 93A claim asserted in Count III. Because, for the reasons that follow, the court agrees with OToole’s position, notwithstanding that this motion addresses only Count III, summaryjudgment shall enter dismissing both remaining counts of the Second Amended Complaint. [1]
FACTS
The following facts, in addition to those set out in the introduction, are undisputed or viewed in the light most favorable to the Jicks.[2]
In the Swan litigation the Jicks sought prejudgment security. An ex parte trustee process attachment was granted on certain Swan bank accounts. At a hearing in the Superior Court, following the entry of that ex parte order, OToole represented to the court that Swan had funds in excess of $300,000 on deposit at Bank of America in two accounts and presented bank statements to the court purportedly supporting this representation. The Jicks’ attorney did not review the bank statements presented to the court and the statements do not support OToole’s representation regarding Swan’s funds on deposit.[3] OToole’s representation to the court regarding the amount of money in the bank accounts was a conscious misrepresentation of fact.
After the hearing, the court entered a preliminary injunction essentially enjoining Swan from reducing the amounts in these bank accounts below $300,000, except to pay for goods or services associated with the work Swan was to perform on the Jicks’ house. 'Hie preliminary injunction also prohibited Swan from selling or encumbering a property that he owned in Los Angeles, dissolved the trustee process, ordered the parties to mediate, and, if the mediation failed, ordered the Superior Court action stayed pending binding arbitration before retired Appeals Court Judge Gerald Gillerman. At some point, Gillerman was replaced as arbitrator by retired Appeals Court Judge Rudolf Kass.
At a hearing before arbitrator Kass that preceded the arbitration trial, OToole unsuccessfully asked arbitrator Kass to dissolve the preliminaiy injunction. In connection with that request, he stated words to the effect that Swan was in compliance with the preliminary injunction and there was still $300,000 in the *270 accounts. O’Toole knew that this statement was false when he made it. Then, during the trial before arbitrator Kass, O’Toole “sat silently” while Swan testified, in response to a question posed by the Jicks’ attorney, that $300,000 was still in the Bank of America accounts. Swan’s statement was false, and O’Toole was aware of its untruthfulness.
Swan filed a bankruptcy petition in California, and the Jicks have not recovered anything on their judgment.[4] If O’Toole had not made the statements set forth above or failed to take action in response to Swan’s false testimony, the Jicks would have been able to satisfy the judgment that they recovered against Swan.
DISCUSSION
A. The Litigation Privilege
The first element of any claim for intentional misrepresentation is that the defendant made a false representation of a material fact. See Barrett Associates, Inc. v. Aronson, 346 Mass. 150, 152 (1963). The intentional misrepresentations on which the Jicks’ claims against O’Toole rest are: (a) two false statements allegedly made by O’Toole, (i) a statement made to a Superior Court judge at a hearing to dissolve the attachment on trustee process/enter a preliminary injunction, and (ii) a statement made at a pretrial hearing to the arbitrator; and (b) a false statement testified to by Swan during arbitration that O’Toole did not correct. Each of these statements was made to a judge or arbitrator in court or an arbitral setting.
In Sriberg v. Raymond, 370 Mass. 105, 108 (1976), the ;M_abdltourt commented that: “We have hitherto held that statements by a party, counsel or witness in the institution of, or during the course of, a judicial proceeding are absolutely privileged provided such statements relate to that proceeding.” The issue before the SJC in Sriberg was whether that rule should be extended to communications made by counsel before a lawsuit is filed. The SJC concluded that it should. In ruling for the defendant, it made the following statements concerning the public policy underlying the privilege:
The public policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients commends itself to us. The basic elements of such a policy were recognized early in the Commonwealth by Chief Justice Shaw in the following terms: “(I]t is, on the whole, for the public interest, and better calculated to subserve the purposes of justice, to allow counsel full freedom of speech, in conducting the causes, and advocating and sustaining the rights, of their constituents; and this freedom of discussion ought not to be impaired by numerous and refined distinctions.” Hoar v. Wood, 3 Met. 193, 197198 (1841).
While most of the earlier case law involving the litigation privilege, like Sriberg, arose in the context of claims for defamation, more recent decisions appear uniformly to have held that the privilege applies not only to claims for libel or slander, but to all civil claims. For example, in Sullivan v. Birmingham, 11 Mass.App.Ct. 359 (1981), the issue before the Appeals Court was whether the inclusion of an ad damnum amount in a medical malpractice complaint could give rise to civil liability on the part of the plaintiff in that action or his attorneys. In concluding that the absolute litigation privilege was a bar to all civil actions brought against counsel for statements made in the course of litigation, the Appeals Court reasoned as follows:
“The rule exists, not because the malicious conduct of such persons ought not to be actionable, but because, if their conduct were actionable, actions would be brought against them in cases in which they had not spoken falsely and maliciously; it is not a desire to prevent actions from being brought in cases where they ought to be maintained, but the fear that if the rule were otherwise, numerous actions would be brought against person who were acting honestly in the discharge of a duly. It may be urged, of course, that a false statement, known to be untrue, and dictated by malice, should always be the subject of a civil remedy. But this bald method of stating the question assumes both the untruth and the malice.” Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L.Ref. 463, 469-70 (1909). This policy would be severely undercut if the absolute privilege were to be regarded as less than a bar to all actions arising out of the conduct of the parties and/or witnesses in connection with a judicial proceeding ... If it is desirable to create an absolute privilege in defamation . . . because we do not want an attorney or party to have to be concerned with libel or slander actions . . . we should not remove one concern and saddle him with another for doing precisely the same thing. This reasoning compels us to find the defendants have an absolute defense to all of the plaintiffs claims for relief.
Id. at 367-68 (internal quotations and citations to cases omitted for simplicity).
In Blanchette v. Cataldo, 734 F.2d 869, 877 (1st Cir. 1984), the First Circuit Court of Appeals, applying Massachusetts law, reached the same conclusion. The issue before the court in that case was whether statements made by an attorney during the course of a litigation could be the predicate for a claim of malicious interference with business relations. Citing Sullivan, now Supreme Court Justice Breyer commented that “Massachusetts courts have applied the [litigation] privilege, not only in defamation cases, but as a general bar to civil liability based on the attorney’s statements” so long as those statements were pertinent to court proceedings. The First Circuit ruled that the defendant’s statements “were within the absolute *271 privilege covering attorneys’ statements made in connection with the conduct of litigation” and dismissed the claim.
In Doe v. Nutter, McClennen & Fish, 41 Mass.App.Ct. 137 (1996), the plaintiff brought an action against the defendant lawyers asserting claims “for violation of G.L.c. 93A, violation of the Massachusetts Civil Rights Act, invasion of privacy, and intentional infliction of emotional distress” based upon statements made in the defendant attorneys’ response to a chapter 93A demand letter sent by plaintiffs counsel to their client. The Appeals Court affirmed the trial court’s dismissal of the plaintiffs complaint based upon its proper application of the absolute litigation privilege. In so doing, it stated:
The plaintiffs, however, misconstrue the privilege which attaches to statements made by an attorney in the institution or conduct of litigation or in conferences and other communications preliminary to litigation . . . The privilege is absolute . . . An absolute privilege provides a complete defense even if the offensive statements are uttered maliciously or in bad faith ... In addition, the absolute privilege which attaches to those statements protects the maker from any civil liability based thereon ... To rule otherwise would make the privilege valueless if an individual would then be subject to liability under a different theory.
Id. at 140-41 (internal citations and quotations omitted). See also Correlias v. Viveiros, 410 Mass. 314, 324 (1991) (where the SJC dismissed intentional infliction of emotional distress claims along with a defamation claim and observed that: “A privilege which protected an individual from liability for defamation would be of little value if the individual were subject to liability under a different theory of tort”).
In a more recent, carefully reasoned decision of the Superior Court, Judge Brassard dismissed a fraud claim asserted against an attorney for allegedly fraudulently concealing the existence of an insurance policy and falsely answering interrogatories. See Lucas v. Newton-Wellesley HospitaL CA No. 10-635 (July 20, 2001). As in the instant case, there, the allegedly false statements may have had the effect of preventing the plaintiff from recovering on a judgment entered in her favor, and, if actually made by the attorney, would have been a violation of the Rules of Professional Conduct. Nonetheless, application of the absolute privilege required that the plaintiffs claims be dismissed, as the allegedly false statements could not be the predicate for civil liability of the attorney to the adverse party in the underlying litigation. See also United States v. Rockland Trust Co. 860 F.Sup. 895, 903 (D.Mass. 1994) (where a fraud claim against an attorney for allegedly misrepresenting the financial position of a debtor was dismissed because of the litigation privilege).
In the instant case, there can be no doubt that O’Toole’s statements or silence in response to his client’s testimony occurred in the course of a pending judicial proceeding. Indeed, the statements were made to a judge and an arbitrator. Compare Melzer v. Grant, 193 F.Sup.2d 373 (D.Mass. 2002) (where the United States District Court struggled with the question of whether the privilege applied to statements in a letter that was sent in connection with a legal proceeding that had not been filed but was allegedly under consideration). It would appear, therefore, that the well-established absolute litigation privilege would bar the claims that the Jicks assert against O’Toole. The Jicks, however, argue that a recent decision of the Appeals Court, Nova Assignments, Inc. v. Kunian, 77 Mass.App.Ct. 34 (2010), has changed, or at least clarified, the litigation privilege doctrine in a manner that supports their claims. The court disagrees.
In Nova, plaintiff Nova was the assignee of claims that a law firm (hereafter “PBL”) asserted against defendant Kunian, also an attorney. PBL had represented a client (hereafter “KCI”) in a litigation to secure rights to develop certain real estate. While an appeal was pending in the real estate litigation, a dispute concerning the amount of PBL’s legal fees arose. PBL threatened to withdraw as counsel for KCI and attach the real estate. Kunian began to represent KCI in connection with this fee dispute. An interim resolution of the fee dispute was reached. KCI’s principal agreed to negotiate or mediate the fee dispute with PBL. Additionally, Kunian told PBL that he, Kunian, would arrange for the escrow of funds sufficient to pay the disputed PBL fee and he would hold the funds in escrow. PBL obtained a decision favorable to KCI in the appeal, and, thereafter KCI entered into a purchase and sale agreement (“P and S”) for the sale of the property to a third party. Kunian drafted the P and S. It included a provision in which the buyer agreed to hold its offer confidential and, in particular, not tell any of KCI’s contractors, including PBL, about it. Kunian represented KCI at the closing on the sale of the property. After paying his firm’s legal fees from the proceeds of the sale, he wired the balance of the funds to KCI outside of Massachusetts. When later confronted by PBL, Kunian said that he had forgotten about his assurance that he would escrow funds for PBL’s benefit.
The Nova case was before the Appeals Court on an appeal from an order granting Kunian’s motion for summary judgment. The Appeals Court concluded that, on the summary judgment record before it, a jury could conclude that Kunian had personally promised to arrange an escrow of funds and to hold the funds in escrow himself. Implicit in Kunian’s promises were representations that he had the power and intent to do that. A jury “might reasonably infer that Kunian knew at the time he made his representations that he would not place the money in escrow and serve as an *272 escrow agent, or that he should have known at that time that he would not be able to do so.” Id. at 39. The Appeals Court held that while there were many disputed issues of fact for a jury to decide, a fraud claim could not be dismissed as a matter of law on the record before it.
The Appeals Court next focused on Kunian’s conduct in drafting the P and S in a manner designed to prevent PBL from learning about the sale of the property. It concluded that this conduct could support a claim for aiding and abetting KCI’s fraud. Id. at 40. The Appeals Court also held that the allegedly false promise to be an escrow agent and the drafting of the P and S in a manner to conceal the sale could also potentially support a claim for violation of Chapter 93A. Id. at 43-44.
The Appeals Court addressed Kunian’s argument that he had not engaged in trade or commerce and therefore could not be liable under Chapter 93A in a footnote. It held that, if the jury found that Kunian had (i) misrepresented his intention to escrow the funds and/or (ii) acted as “an integral member of the KCI team in furtherance of a fraudulent scheme by KCI to dupe PBL” by drafting the P and S, Kunian may have injected himself into the commercial “relationship between KCI and PBL sufficiently to support liability under G.L.c. 93A,’ll.”[5] Id. at 44 n.7.
Notably, the Appeals Court’s decision in Nova does not mention the absolute litigation privilege nor does it cite any of the case law discussed above that defines that privilege. Indeed, there is no indication in the Nova opinion that Kunian raised the litigation privilege as a defense. While Kunian’s promise to escrow the funds was made in connection with a dispute between PBL and KCI, there was no litigation pending between them. But even more importantly, Kunian was not making a statement about KCI in promising to escrow the funds, he was making an express promise that he would take a certain action.[6] That promise was both personal and independent of any litigation, and, if made with no intent of fulfilling it, grounds for a fraud claim. In fact, the Appeals Court, noted, in passing, that the plaintiff had not brought a breach of contract claim against Kunian, and it was not expressing any opinion on whether such a claim would succeed. Id. at 38 n.4. Kunian’s conduct in drafting the P and S clearly had no relation to a pending or threatened proceeding.
Because Nova makes no reference to the absolute litigation privilege, does not discuss the case law that defines that privilege, and Kunian’s conduct involves personal promises and conduct not undertaken in connection with litigation, this Court concludes that Nova does not represent a sea change in the absolute litigation privilege doctrine that immunizes an attorney from civil liabiliiy for statements made in court on behalf of his client.
Since the absolute litigation privilege shields OToole from civil liability based on claims of misrepresentation and violation of Chapter 93A, summary judgment will enter dismissing both Counts II and III.
B. The Plaintiffs Were Not Engaged in Business.
There is an additional reason that Count III, which asserts a violation of Chapter 93A, must be dismissed. The Second Amended Complaint does not indicate whether the Jicks are proceeding in Count III under §9 or §11 of chapter 93A. However, the complaint does not allege that a Chapter 93A demand letter was sent to O’Toole before this claim was asserted, and it is undisputed that no demand letter was sent. Under §9(3), “(n]ot only must such a letter be sent, but plaintiff must also plead that he has complied with this requirement as a prerequisite to suit.” Kanamaru v. Holyoke Mutual Ins. Co., 72 Mass.App.Ct. 396, 407-08 (2008). In their opposition to O’Toole’s motion for summary judgment, the Jicks contend that they are proceeding under §11, which has no demand letter requirement. §11, however, applies only to “unlawful or deceptive acts or practices in the conduct of any trade or commerce between two businesses.” Massachusetts Farm Bureau Fed., Inc. v. Blue Cross of Massachusetts, Inc. 403 Mass. 722, 729 (1989). While “(t]he dividing line between a consumer claim and a business claim for purposes of G.L.c. 93A, §§9 and 11, is not always clear” in this case the question is not at all difficult. Compare Frullo v. Landenberger, 61 Mass.App.Ct. 814, 821 (2004). The Jicks’relationship with Swan arose out of a consumer transaction, interior design work on their home. When they sued Swan because they were displeased with Swan’s performance, they were not engaged in trade or commerce. Compare, Kirkland, supra (where an attorney was found to have injected himself into a commercial transaction between his client and another business). The Jicks have no viable claim against O’Toole under G.L.c. 93A, § 11.[7] Therefore, summary judgment shall enter dismissing Count III for this additional reason.
ORDER
For the foregoing reasons, the defendants’ motion is ALLOWED and summary judgment shall enter dismissing Counts II and III. As Count I was previously dismissed as a result of an earlier order of this court, Final Judgment shall enter dismissing the Second Amended Complaint.

At the hearing on the motion for summary judgment, the Jicks’ attorney vigorously argued that the litigation privilege did not apply to the claims asserted in either Count II or Count III, but did not argue that the previous procedural order entered by the court should prevent the court from considering its application to both the misrepresentation count and the 93A count or that the Jicks were prejudiced by their reliance on the earlier order.

OToole’s statement of undisputed facts begins with a description of the Jicks’ efforts to obtain pretrial security for their claim against Swan and the efficacy of the orders that were entered. Some of these “facts” are disputed, but they are not material to any issue raised by OToole’s motion. The court notes that the inclusion of “facts” that are not material to any issue raised by the summary judgment motion, or which are stated in a contentious manner certain to draw objections, are not helpful to the court in addressing motions for sum- *273 maiy judgment, in particular motions like the pending one that raise close and complex questions of law.

The bank statements were placed in the Superior Court Swan litigation file. They show a combined balance of something less than $250,000.

The Jicks’ supplementary statement of undisputed facts makes reference to funds that O’Toole purportedly held which belonged to Swan and that he returned to Swan after judgment entered against Swan. However, at oral argument, the Jicks’ counsel confirmed that Counts II and III of the second amended complaint were based only on the three alleged misrepresentations described above.

The Appeals Court cited Kirkland v. Constr. Co. v. James, 39 Mass.App.Ct. 559 (1995), and St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis, 262 F.3d 53, 67 (1st Cir. 2001), in support of this holding. The Appeals Court also observed that Kunian had not argued that he and PBL were not engaged in trade and commerce at the time of the alleged misrepresentation and drafting of the P and S. Nova, 77 Mass.App.Ct. at 44 n

“Nova’s theory is that Kunian knowingly or negligently made false personal representations, distinct from representations that Kunian may have made on behalf of his client, and that PBL foreseeably relied to its detriment on those personal representations.” Id. at 37-38.

The court offers no opinion on the question whether OToole was engaged in trade or commerce with the Jicks solely by virtue of his representation of Swan in the Swan litigation. See, e.g., Morrison v. Toys ‘R’ Us, Inc., 441 Mass. 451, 455 (2004).